******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

MICHAEL J. O'BRIEN *v.* KATHLEEN E. O'BRIEN
(SC 19635)

Rogers, C. J., and Palmer, McDonald, Espinosa, Robinson and Vertefeuille, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dis-
solved, appealed to the Appellate Court from certain financial orders
that the trial court had entered on remand from a previous appeal from
the judgment of dissolution. During the pendency of the dissolution
action and the previous appeal, while certain automatic court orders
prohibiting the sale, exchange, or transfer of any property without the
consent of the other party or an order of the court were in effect,
the plaintiff executed three stock transactions without the defendant's
consent or a court order. The transactions consisted of the sale of vested
shares of stock after the dissolution action was filed but before the
divorce decree was entered, and the exercise of certain stock options
that the plaintiff received after the dissolution action was filed and
before the divorce decree was entered, but that vested and were exer-
cised during the pendency of the previous appeal. The plaintiff executed
these transactions in light of his concerns about the volatility of the
stock market at the time of the transactions and the need to preserve,
in the party's best interest, the current value of the stocks, and he
placed the proceeds in a bank account and subsequently disclosed the
transactions to the defendant. On remand from the previous appeal, the
defendant filed a motion to hold the plaintiff in contempt for his pur-
ported violation of the automatic orders. At the remand trial, the defen-
dant presented expert testimony indicating that the value of the stocks
and options at the time of the transactions was approximately $2.5
million, that they would have had a value of approximately $6 million
at the time of the remand trial, and that the transactions thus had caused
a loss to the estate of approximately $3.5 million. The trial court found
that, although the plaintiff had violated the automatic orders, the viola-
tions were not wilful and, therefore, declined to hold the plaintiff in
contempt. Because the transactions had caused a significant loss to the
marital estate, however, the trial court considered the violations in
awarding the defendant approximately two thirds of the value of the
marital property. On appeal, the Appellate Court concluded, inter alia,
that the trial court improperly had considered the violations in making
its financial awards because it lacked authority to punish the plaintiff
pursuant to its civil contempt power by reducing the plaintiff's share
of the marital estate, as his actions did not rise to the level of contempt
or a dissipation of marital assets. The Appellate Court therefore reversed
the trial court's judgment with respect to the financial orders and
remanded the case for a new hearing on all financial matters. On the
granting of certification, the defendant appealed to this court, claiming
that the Appellate Court incorrectly concluded that the trial court lacked
authority to afford her a remedy for the plaintiff's violations of the
automatic orders in the absence of a contempt finding. *Held*:

1. The trial court, having possessed inherent authority to make a party whole
for harm caused by another party's violation of a court order, even when
the court does not find the offending party in contempt, the Appellate
Court incorrectly concluded that the trial court improperly had consid-
ered, in making its financial orders, the plaintiff's violations of the auto-
matic orders stemming from his decision to conduct the stock
transactions without the defendant's consent or the trial court's permis-
sion; a trial court may remedy any harm caused by a party's violation
of a court order by compensating the harmed individual for losses
sustained as a result of the violation, regardless of whether the court
finds that party in contempt, prior decisions of the Appellate Court have
upheld compensatory awards imposed in contempt proceedings for the
violation of a court order, even in the absence of a contempt finding,
and, accordingly, the trial court in the present case properly exercised
its discretion by adjusting the property distribution to account for the
loss caused by the plaintiff's violation of the automatic orders.

2. The plaintiff could not prevail on his claim that the trial court's financial award was erroneous because it was excessive and based on an improper method for valuing the loss to the marital estate; the trial court fairly determined the loss to the marital estate, the court's adjustment of the property distribution in favor of the defendant did not exceed the defendant's reasonable share of the loss resulting from the plaintiff's transactions, and, because the court's remedial award in adjusting the property distribution was made pursuant to its inherent authority to make a party whole for the violation of a court order rather than pursuant to the statute (§ 46b-81) governing equitable distribution of marital property, it was within the court's discretion to consider the value that the stocks and options would have had at the time of the trial on remand from the previous appeal rather than their value as of the date of dissolution or as of the dates that the violations of the automatic orders occurred, as the court was entitled to put the defendant in the position in which she would have been in the absence of the plaintiff's violation of the automatic orders.

3. The plaintiff could not prevail on his claims, as alternative grounds for affirming the Appellate Court's judgment, that the plaintiff's transactions did not violate the automatic orders because those transactions were made in the usual course of business and that the trial court ignored the usual course of business exception to the provision in the automatic orders prohibiting the sale, transfer or exchange of property during the pendency of the dissolution proceeding: although the trial court did not expressly consider, in its memorandum of decision, the application of the usual course of business exception to the plaintiff's transactions, the trial court expressly found that the plaintiff had violated the automatic orders, which necessarily implied that the court also made the subsidiary finding that the plaintiff's conduct did not fall within any exception; moreover, this court declined to adopt a rule, urged by the plaintiff, that stock transactions during a dissolution proceeding are always made in the usual course of business or are presumed to fall within that exception, such a rule not having been supported by the text of the automatic orders or having been consistent with their purpose.

4. The trial court's conclusion that the stock options the plaintiff had exercised were marital property subject to distribution between the parties was not clearly erroneous; although the plaintiff's options did not vest and were not exercised until after the dissolution of the parties' marriage, the plaintiff received them during the marriage, and the court reasonably credited the portion of the plaintiff's testimony that the options represented payment for past services.

5. The plaintiff could not prevail on his claim, as an alternative ground for affirming the Appellate Court's judgment, that the trial court's award of retroactive alimony was improper because it purportedly required the plaintiff to pay the arrearage out his share of the marital assets, thereby effectively reducing his share of the property distribution; trial courts are vested with broad discretion to award alimony and are free to consider the marital assets distributed to the party paying the alimony as a potential source of alimony payments, and the court's property distribution award in combination with the retroactive alimony award were not inequitable, as they together were not excessive and reflected the unequal earnings potential of the parties, the alimony award was to diminish over time, justifying a greater upfront distribution, and a significant component of the distribution to the defendant was the trial court's remedial award for the plaintiff's violation of the automatic orders.

Argued December 14, 2016—officially released June 27, 2017

*Procedural History*

Action for the dissolution of marriage, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the defendant filed a cross complaint; thereafter, the case was tried to the court, *Hon. Howard T. Owens, Jr.*, judge trial referee; judgment dissolving the marriage and granting certain other relief, from which the plaintiff appealed to the Appellate Court; subsequently, the court, *Hon. Howard T. Owens,*

*Jr.*, judge trial referee, granted the defendant's motion for attorney's fees, and the plaintiff filed an amended appeal; thereafter, the Appellate Court, *Sheldon* and *West, Js.*, with *Lavine, J.*, dissenting, reversed in part the trial court's judgment and remanded the case for a new trial on all financial issues; on remand, the court, *Pinkus, J.*, rendered certain financial orders, and the plaintiff appealed to the Appellate Court, *Beach*, *Prescott* and *Bear, Js.*, which reversed the trial court's judgment and remanded the case for a new trial on all financial issues, and the defendant, on the granting of certification, appealed to this court. *Reversed*; *judgment directed.*

*Daniel J. Krisch*, with whom was *Aidan R. Welsh*, for the appellant (defendant).

*Daniel J. Klau*, for the appellee (plaintiff).

*Opinion*

PALMER, J. In this certified appeal arising from a marital dissolution action, we must determine whether a trial court properly may consider a party's violation of a court order when distributing marital property, even if the trial court finds that the violation is not contemptuous. The plaintiff, Michael J. O'Brien, filed this action to dissolve his marriage to the defendant, Kathleen E. O'Brien. During the pendency of the action, the plaintiff sold shares of stock and exercised certain stock options without first receiving permission from either the defendant or the trial court, as required by Practice Book § 25-5,[1] which also provides that a party who fails to obey the orders automatically entered thereunder may be held in contempt of court. The trial court found that the plaintiff's transactions violated those orders but did not hold the plaintiff in contempt because the court concluded the violations were not wilful. Nevertheless, because the transactions had caused a significant loss to the marital estate, the court considered that loss when it distributed the marital property between the parties, awarding a greater than even distribution to the defendant. On appeal, the Appellate Court concluded that, in the absence of a finding of contempt, the trial court lacked the authority to afford the defendant a remedy for the plaintiff's violation of the automatic orders. See *O'Brien* v. *O'Brien*, 161 Conn. App. 575, 591, 128 A.3d 595 (2015). We thereafter granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court correctly determine that the trial court abused its discretion when it considered the plaintiff's purported violations of the automatic orders in its decision dividing marital assets [even though the court did not hold the plaintiff in contempt of court for those violations]?" *O'Brien* v. *O'Brien*, 320 Conn. 916, 131 A.3d 751 (2016). We agree with the defendant that the trial court properly exercised its discretion in considering the plaintiff's violations of the automatic orders in its division of the marital assets, and, therefore, we reverse the judgment of the Appellate Court.

The Appellate Court's opinion and the record contain the following undisputed facts and procedural history relevant to this appeal. The parties were married in 1985 and had three children together, all of whom were under the age of eighteen when the trial court rendered the dissolution judgment. See *O'Brien* v. *O'Brien,* supra, 161 Conn. App. 578. The parties are each well educated and have had lucrative careers. See id. The plaintiff holds a law degree and is employed as senior vice president, general counsel, and secretary of Omnicom Group, Inc. (Omnicom). Id. His base salary is $700,000 per year, and his compensation has also included a cash bonus of varying amounts and noncash compensation, usually in the form of stock or stock options. Id. In the

years leading up to the dissolution, the plaintiff's annual cash compensation averaged at least $1.2 million, along with additional noncash compensation. See id. The defendant holds a college degree and was previously employed as a managing director for Credit Suisse, earning more than $1 million annually. Id. She left her employment in 2003 to devote her time to raising the parties' children. Id. The defendant later participated in a "returnship" program with JP Morgan Chase, earning about $143,000 annually. Id.

At the time of the dissolution action, the parties' assets consisted principally of numerous bank and investment accounts, their principal residence in the town of Greenwich, a second home, and personal property. The plaintiff also held vested shares of Omnicom stock and unvested Omnicom stock options.

The plaintiff filed the present action in 2008, alleging that the marriage had irretrievably broken down. See id., 579 and n.3. He sought a judgment dissolving the marriage, an equitable division of the marital estate, and orders regarding child custody and support.

Attached to the plaintiff's complaint was a copy of the automatic orders required by Practice Book § 25-5 (d). In accordance with the requirement of § 25-5 (b) (1), that attachment included the admonition that the parties were not permitted to "sell, transfer, exchange, assign, remove, or in any way dispose of . . . any property" while the dissolution action was pending without the prior consent of the other party or the court.

The trial court rendered judgment dissolving the parties' marriage in September, 2009. The court also entered custody orders regarding the minor children and financial orders distributing the marital property between the parties. In its financial orders, the trial court effectively awarded 55 percent of the marital assets to the defendant and 45 percent to the plaintiff. *O'Brien* v. *O'Brien*, supra, 161 Conn. App. 580. These marital assets included all of the plaintiff's vested and unvested Omnicom stock shares and options. See id., 580 n.4. The trial court also ordered the plaintiff to pay unallocated alimony and child support to the defendant. See *O'Brien* v. *O'Brien*, 138 Conn. App. 544, 545–46, 53 A.3d 1039 (2012), cert. denied, 308 Conn. 937, 938, 66 A.3d 500 (2013).

The plaintiff appealed from the trial court's financial orders, challenging, inter alia, its unallocated alimony and child support award. Id., 545. The Appellate Court agreed with the plaintiff's claim concerning the alimony and child support award and reversed the trial court's judgment as to its financial orders, but did not disturb the decree dissolving the marriage. See id., 546, 557. The Appellate Court remanded the case to the trial court for a new trial on all financial issues. Id., 557. The parties do not dispute that the appeal stayed the

trial court's financial orders and that the automatic orders remained in effect during the pendency of the appeal.

While the dissolution action or the appeal from the judgment of dissolution was pending—and while the automatic orders thus remained in effect—the plaintiff executed three stock transactions that are the subject of the present appeal. See *O'Brien* v. *O'Brien*, supra, 161 Conn. App. 579, 581. The plaintiff made the first transaction in February, 2009, one year after filing the dissolution action but before the dissolution decree entered in September, 2009. See id., 579. In the first transaction, the plaintiff sold all of his 28,127 vested Omnicom shares. Id. He did so without first seeking the consent of the defendant or the approval of the trial court. Id. According to the plaintiff, he was concerned about volatility in the stock market following a market decline in 2008 and thought that preserving the current value of the shares through a sale was in the parties' best, immediate interest. See id. The plaintiff placed the proceeds from the sale into a bank account and disclosed the sale to the defendant approximately two months later when he submitted an updated financial affidavit.

The plaintiff executed the second and third transactions in 2010 and 2012, respectively, after the original trial and while the first appeal was pending. See id., 581. In these two transactions, the plaintiff exercised a total of 75,000 Omnicom stock options that he had received as part of his noncash compensation while the dissolution action was still pending and before the trial court rendered judgment dissolving the marriage. Id. The options had vested after the trial court's dissolution judgment was rendered but before the Appellate Court reversed the trial court's financial orders. See id., 581–82. He exercised 22,500 options in the first transaction and 52,500 options in the second transaction. Each time, the plaintiff immediately converted the options to cash and retained the cash proceeds in a bank account. As with his earlier stock sale, the plaintiff did not seek consent from the defendant or approval from any judicial authority before exercising the options. Id.

On remand, the defendant filed a motion for contempt with respect to the plaintiff's transactions. Id., 582. The defendant asserted that the plaintiff's transactions violated the automatic orders because he had sold, exchanged or disposed of property without prior permission, as required by Practice Book § 25-5 (b) (1). See id. In her motion, the defendant requested that the court find the plaintiff in contempt, order the plaintiff to pay legal fees and costs in connection with the contempt motion, and award any other relief that the court deemed appropriate. Id.

At the remand trial in February, 2014, the defendant presented expert testimony to establish the economic

loss resulting from the plaintiff's transactions. See id. The defendant's expert testified that the stock shares and options were worth approximately $2.5 million at the time the plaintiff sold and exercised them, respectively. The expert further testified that, if the plaintiff had not sold or exercised the shares and options but instead had retained them, they would have had a value, as of the date of the retrial, of about $6 million. See id. Thus, according to the defendant's expert, the plaintiff's decision to sell the shares of stock and exercise his stock options had caused a net loss to the marital estate of about $3.5 million. Id.

For his part, the plaintiff admitted that he had not sought permission to engage in the transactions. He nevertheless testified that he had consulted with attorneys concerning the transactions before executing them and that he did not believe that he otherwise needed permission to execute the transactions. The plaintiff further testified that he thought converting the shares to cash would best preserve their value in the face of ongoing market volatility. Id., 579.

After trial following the remand, the trial court issued a memorandum of decision and new financial orders. The court first explained that, in crafting its financial orders, it had considered the testimony and exhibits presented, along with the required statutory criteria, set forth in General Statutes § 46b-81,[2] governing the trial court's distribution of marital property. The court then turned to its findings of fact. After setting forth the history of the parties' marriage and careers, the court determined that the plaintiff's earning capacity exceeded the defendant's, finding that the plaintiff had earned at least $1.2 million annually in the years leading up to the dissolution, compared to $143,000 that the defendant earned annually. With respect to the marital assets, the court explained that it had valued them as of the original date of dissolution. Id., 583. The parties had agreed to the value of most of the marital assets in a pretrial stipulation, which the court incorporated by reference. Id.

With respect to the transactions, the trial court found that the plaintiff had sold 28,127 shares of Omnicom stock and exercised 75,000 Omnicom stock options while the automatic orders were in effect and without the defendant's consent or the court's permission. Id., 579, 581. Although concluding that the plaintiff's transactions "did in fact violate the automatic orders," the court did not hold the plaintiff in contempt because it found that the plaintiff had sought the advice of counsel concerning the transactions, and, consequently, his violations were not wilful. Nevertheless, the court explained that the transactions caused "a significant loss to the marital estate" and that the court had "taken into account these transactions in making [its financial] awards."

The trial court then turned to property distribution. The assets in the marital estate had a value of approximately $6.5 million.[3] The trial court awarded the defendant the principal residence and permitted her to keep a pension from Credit Suisse, as well as portions of the parties' bank and retirement accounts, among other assets. The total value of the award to the defendant was approximately $4.4 million. The trial court awarded the plaintiff portions of the parties' bank and retirement accounts, among other assets. The total value of the award to the plaintiff was approximately $2.1 million. According to the plaintiff's accounting, the award amounted to a 68 percent distribution of the marital estate to the defendant and a 32 percent distribution to the plaintiff. The trial court also ordered the plaintiff to pay the defendant child support and alimony for a period of twenty-one years, with a reduction in the amount of alimony every seven years.[4]

After the trial court issued its new financial orders, the plaintiff filed a motion for articulation, asking the court to explain the effect of the plaintiff's transactions on the court's property distribution and how the trial court had valued the loss that the transactions caused to the marital estate. In an articulation, the trial court explained that "financial orders in dissolution proceedings often have been described as a mosaic, in which all of the various financial components are carefully interwoven with one another. . . . Therefore, it is impossible to say, with great specificity, exactly how the court 'took into account' the [sale] of the shares and the exercise of the stock options by the plaintiff. However, these transactions by the plaintiff were taken into account when the defendant was awarded the family home and her pension from Credit Suisse, as well as the equitable division of all of the other assets of the parties." (Citation omitted.) As for the loss to the estate, the trial court explained that it had credited the testimony of the defendant's expert. The court thus determined that, if the plaintiff had not sold the shares and exercised the stock options when he did but, instead, had retained them as contemplated by the automatic orders, they would have been worth about $3.5 million more at the time of the trial following remand when compared to their value at the time that the plaintiff actually sold or exercised them.

The plaintiff appealed to the Appellate Court, which reversed the trial court's financial orders. See *O'Brien* v. *O'Brien*, supra, 161 Conn. App. 577, 593. Among other claims, the plaintiff asserted that the trial court improperly had considered the transactions when fashioning its orders. See id., 587–88. The plaintiff argued that, even if his actions technically violated the automatic orders, the trial court improperly held his actions against him when distributing the property because he had not been found in contempt and did not otherwise

intentionally dissipate the assets or cause any legally cognizable harm. See id., 588–89.

The Appellate Court agreed with the plaintiff, concluding that the plaintiff's violations of the automatic orders could be considered by the court only if they rose to the level of contempt or a dissipation of marital assets. Id., 589. The court explained that, "even if the plaintiff technically violated the automatic orders when he sold stock and exercised options during the pendency of the dissolution action without permission . . . the resulting sanction imposed on the plaintiff by the court—namely, some unspecified reduction in the plaintiff's share of the marital estate—was not legally justified and, thus, an abuse of discretion. First, the court expressly found that the plaintiff's actions were not contumacious, and, thus, we conclude that it lacked any authority to punish the plaintiff pursuant to its civil contempt powers. Second, although in exercising its statutory authority under § 46b-81, the court certainly could take into account, when dividing the parties' assets, whether a party had engaged in a dissipation of those assets, there is nothing in the present record that would support a finding that the plaintiff intended to hide or to dissipate assets, nor did the court make such a finding." (Footnote omitted.) Id.

Concerning the trial court's contempt powers, the Appellate Court further explained that "[j]udicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. . . . [If] compensation is intended, a fine is imposed, payable to the complainant." (Internal quotation marks omitted.) Id., 590. Because, however, the trial court had not found the plaintiff in contempt, the Appellate Court concluded that the trial court had "lost its authority pursuant to its contempt powers to take any remedial action against the plaintiff simply because, with the luxury of hindsight, those transactions had proven unprofitable or even unwise. In other words, if the court had found the plaintiff in contempt of the automatic orders, that conclusion might have justified its further consideration of the effect those violations had on the assets available for distribution. In such circumstances, the court could have taken remedial action, perhaps reducing the plaintiff's distribution in an amount necessary to compensate the defendant. Nevertheless, having effectively denied the defendant's motion for contempt, the court was required to dispose of the marital assets in accordance with its authority under § 46b-81, which did not include the power to punish in the absence of dissipation." Id., 591.

With respect to the trial court's authority to consider dissipation under § 46b-81, the Appellate Court noted that the trial court had not made a finding of dissipation,

and that such a finding would be unwarranted in the present case because, as this court explained in *Gershman* v. *Gershman*, 286 Conn. 341, 348, 351, 943 A.2d 1091 (2008), "[p]oor investment decisions, without more, generally do not give rise to a finding of dissipation. . . . [A]t a minimum, dissipation in the marital dissolution context requires financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety, coupled with a purpose unrelated to the marriage." (Citation omitted; internal quotation marks omitted.) *O'Brien* v. *O'Brien*, supra, 161 Conn. App. 592.

Because the trial court had not found contempt or dissipation, the Appellate Court concluded that the trial court did not have the authority to compensate the defendant for the plaintiff's transactions, even though those transactions had violated the automatic orders. Id., 593. The Appellate Court reversed the trial court's judgment with respect to its financial orders and remanded the case for a new hearing on all financial matters. Id.

We then granted the defendant's petition for certification to decide whether the Appellate Court correctly concluded that the trial court should not have considered the plaintiff's violations of the automatic orders in its division of the marital assets because the court had not held the plaintiff in contempt for those violations. *O'Brien* v. *O'Brien*, supra, 320 Conn. 916. We answer the certified question in the negative. The plaintiff also has raised three alternative grounds for affirming the Appellate Court's judgment, all of which we reject.

I

We begin with the certified question. The defendant claims that the Appellate Court incorrectly concluded that the trial court lacked the authority to afford her a remedy for the plaintiff's violations of the automatic orders in the absence of a contempt finding. In support of this claim, the defendant contends that the trial court has the power to consider the plaintiff's actions under § 46b-81, which governs a trial court's distribution of marital assets in a dissolution proceeding and empowers the trial court to divide marital assets between the parties upon consideration of "the contribution of each of the parties in the acquisition, *preservation* or *appreciation* in value of" the marital assets. (Emphasis added.) General Statutes § 46b-81 (c). The defendant further contends that the plaintiff's unilateral decision to swap a substantial equity stake—along with its potential for increase in value and dividends—for an asset like cash is the antithesis of preservation and appreciation, and thus may be considered by a court when it divides property under the statute.

We agree with the defendant that the trial court had the authority to consider the plaintiff's transactions

when distributing the marital property, but for reasons different from those advanced by the defendant. Applying plenary review to this question of law; see, e.g., *Maturo* v. *Maturo*, 296 Conn. 80, 88, 995 A.2d 1 (2010); we conclude in part I A of this opinion that a trial court possesses inherent authority to make a party whole for harm caused by a violation of a court order, even when the trial court does not find the offending party in contempt. In part I B of this opinion, we conclude that the trial court properly exercised that authority in the present case.[5]

A

It has long been settled that a trial court has the authority to enforce its own orders. This authority arises from the common law and is inherent in the court's function as a tribunal with the power to decide disputes. *Papa* v. *New Haven Federation of Teachers*, 186 Conn. 725, 737–38, 444 A.2d 196 (1982). The court's enforcement power is necessary to "preserve its dignity and to protect its proceedings." (Internal quotation marks omitted.) *Allstate Ins. Co.* v. *Mottolese*, 261 Conn. 521, 530, 803 A.2d 311 (2002); see also *Middlebrook* v. *State*, 43 Conn. 257, 268 (1876) ("[a] court of justice must of necessity have the power to preserve its own dignity and protect itself"). A party to a court proceeding must obey the court's orders unless and until they are modified or rescinded, and may not engage in "self-help" by disobeying a court order to achieve the party's desired end. (Internal quotation marks omitted.) *Sablosky* v. *Sablosky*, 258 Conn. 713, 719–20, 784 A.2d 890 (2001); see also *Tyler* v. *Hamersley*, 44 Conn. 393, 412 (1877) ("[e]very court must of necessity possess the power to enforce obedience to its lawful orders"); *Rocque* v. *Design Land Developers of Milford, Inc.*, 82 Conn. App. 361, 366, 844 A.2d 882 (2004) ("[t]he interests of orderly government demand that respect and compliance be given to orders issued by courts possessed of jurisdiction of persons and subject matter" [internal quotation marks omitted]), quoting *United States* v. *United Mine Workers of America*, 330 U.S. 258, 303, 67 S. Ct. 677, 91 L. Ed. 884 (1947).

The court has an array of tools available to it to enforce its orders, the most prominent being its contempt power.[6] Our law recognizes two broad types of contempt: criminal and civil. See, e.g., *DeMartino* v. *Monroe Little League, Inc.*, 192 Conn. 271, 278, 471 A.2d 638 (1984). The two are distinguished by the type of penalty imposed. See, e.g., *In re Jeffrey C.*, 261 Conn. 189, 197–98, 802 A.2d 772 (2002); *McTigue* v. *New London Education Assn.*, 164 Conn. 348, 352–53, 321 A.2d 462 (1973). A finding of criminal contempt permits the trial court to punish the violating party, usually by imposing an unconditional fine or a fixed term of imprisonment. See, e.g., General Statutes § 51-33a. Criminal contempt penalties are punitive in nature and employed

against completed actions that defy "the dignity and authority of the court." (Internal quotation marks omitted.) *In re Jeffrey C.*, supra, 197. Civil contempt, by contrast, is not punitive in nature but intended to coerce future compliance with a court order, and "the contemnor should be able to obtain release from the sanction imposed by the court by compliance with the judicial decree." *Connolly* v. *Connolly*, 191 Conn. 468, 482, 464 A.2d 837 (1983). A civil contempt finding thus permits the court to coerce compliance by imposing a conditional penalty, often in the form of a fine or period of imprisonment, to be lifted if the noncompliant party chooses to obey the court. See id.

To impose contempt penalties, whether criminal or civil, the trial court must make a contempt finding, and this requires the court to find that the offending party wilfully violated the court's order; failure to comply with an order, alone, will not support a finding of contempt. See, e.g., *Marshall* v. *Marshall*, 151 Conn. App. 638, 650, 97 A.3d 1 (2014). Rather, "to constitute contempt, a party's conduct must be wilful." *Eldridge* v. *Eldridge*, 244 Conn. 523, 529, 710 A.2d 757 (1998). "A good faith dispute or legitimate misunderstanding" about the mandates of an order may well preclude a finding of wilfulness. (Internal quotation marks omitted.) *Sablosky* v. *Sablosky*, supra, 258 Conn. 718. Whether a party's violation was wilful depends on the circumstances of the particular case and, ultimately, is a factual question committed to the sound discretion of the trial court. Id. Without a finding of wilfulness, a trial court cannot find contempt and, it follows, cannot impose contempt penalties.

But a trial court in a contempt proceeding may do more than impose penalties on the offending party; it also may remedy any harm to others caused by a party's violation of a court order. When a party violates a court order, causing harm to another party, the court may "compensate the complainant for losses sustained" as a result of the violation. (Internal quotation marks omitted.) *DeMartino* v. *Monroe Little League, Inc.*, supra, 192 Conn. 278. A court usually accomplishes this by ordering the offending party to pay a sum of money to the injured party as "special damages . . . ." (Internal quotation marks omitted.) Id., 279.

Unlike contempt penalties, a remedial award does not require a finding of contempt. Rather, "[i]n a contempt proceeding, even in the absence of a finding of contempt, a trial court has broad discretion to make whole any party who has suffered as a result of another party's failure to comply with a court order." (Emphasis omitted; internal quotation marks omitted.) *Clement* v. *Clement*, 34 Conn. App. 641, 647, 643 A.2d 874 (1994); see also *Brody* v. *Brody*, 153 Conn. App. 625, 636, 103 A.3d 981, cert. denied, 315 Conn. 910, 105 A.3d 901 (2014); *Nelson* v. *Nelson*, 13 Conn. App. 355, 367, 536

A.2d 985 (1988). Because the trial court's power to compensate does not depend on the offending party's intent, the court may order compensation even if the violation was not wilful. See, e.g., *Clement* v. *Clement*, supra, 646–47; cf. *DeMartino* v. *Monroe Little League, Inc.*, supra, 192 Conn. 279 ("[s]ince the purpose is remedial, it matters not with what intent the [offending party] did the prohibited act" [internal quotation marks omitted]).

Following this principle, the Appellate Court has upheld compensatory awards imposed in contempt proceedings even when the trial court did not make a contempt finding. For example, in *Clement* v. *Clement*, supra, 34 Conn. App. 641, one party failed to make payments on a home mortgage loan, in violation of a court order, which led to a foreclosure and a loss of equity in the home. See id., 643–44 and n.2. The trial court ultimately vacated an earlier contempt finding but nevertheless declined to vacate a compensatory award equal to the lost equity. Id., 646. The Appellate Court affirmed, explaining that a trial court "has broad discretion to make whole any party who has suffered as a result of another party's failure to comply with [a] court order" and may do so "even in the absence of a finding of contempt . . . ." (Emphasis omitted; internal quotation marks omitted.) Id., 647. And in *McGuire* v. *McGuire*, 102 Conn. App. 79, 81, 924 A.2d 886 (2007), a court order required the parties to a dissolution proceeding to sell their marital home. When one party delayed the closing date, causing a contract for sale to fall through, the trial court did not find contempt but nevertheless ordered the delaying party to pay the other party compensation for the delay. See id., 81–82. On appeal, the Appellate Court, consistent with prior precedent, concluded that a trial court need not find contempt before compensating a party harmed by the violation of a court order. Id., 88–89.

We cited this principle with approval in *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, 260 Conn. 232, 243, 796 A.2d 1164 (2002), and again in *New Hartford* v. *Connecticut Resources Recovery Authority*, 291 Conn. 489, 501 n.20, 970 A.2d 570 (2009). In *AvalonBay Communities, Inc.*, for instance, we explained that, "[i]t would defy common sense to conclude that, merely because a party's violation of a court order was not wilful, the trial court is deprived of its authority to enforce the order." *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, supra, 241–42.

The Appellate Court's reasoning and result in the present case are inconsistent with these decisions. The Appellate Court recognized that a court might compensate a party harmed by a violation of a court order, including by reducing the party's share of the marital assets, but only if the court found the offending party in contempt. See *O'Brien* v. *O'Brien*, supra, 161 Conn.

App. 591. According to the Appellate Court, "[h]aving determined that the plaintiff's transactions were not contumacious . . . the [trial] court lost its authority pursuant to its contempt powers to take any remedial action against the plaintiff" and in favor of the defendant. Id. In light of the decisions from this court and the Appellate Court holding to the contrary, the Appellate Court's conclusion in the present case cannot stand. Parties subject to a court order are bound to follow it and reasonably may rely on an expectation that other parties will also obey the order. Irrespective of whether a violation is wilful, the party violating a court order properly may be held responsible for the consequences of the violation. To hold otherwise would shift the cost of the violation to the innocent party.

We therefore conclude that, although the trial court could not punish the plaintiff because it had not found him in contempt, the court nevertheless properly determined that it could compensate the defendant for any losses caused by the plaintiff's violations of the automatic orders. The plaintiff's transactions—in which he sold and exchanged stock shares and options for cash—plainly violated the automatic orders, which expressly provide that, while the dissolution proceedings are pending, no party shall "sell, transfer, [or] exchange" any property without permission from the other party or the court. Practice Book § 25-5 (b) (1). The automatic orders are intended to "keep the financial situation of the parties at a status quo during the pendency of the dissolution action." *Ferri* v. *Powell-Ferri*, 317 Conn. 223, 232, 116 A.3d 297 (2015). Allowing parties to sell, exchange, or dispose of assets while a dissolution action is pending, and without permission of the other party or the court, would frustrate the trial court's ability to determine which of the parties' property constituted marital property and to distribute the marital assets fairly between the parties. In the present case, the plaintiff's transactions, made without proper permission, disrupted the status quo and prevented the trial court from determining the proper disposition of the stock shares and options, in violation of the automatic orders.

Even if the plaintiff did not intend to violate the court's order, if his unilateral decision to sell the shares and exercise the options caused a loss to the marital estate—and in turn to the defendant—then the trial court was justified in determining that the plaintiff should bear the losses. To be sure, the plaintiff may not have appreciated the extent of the harm his transactions might cause in the future. And, ordinarily, a party in a dissolution proceeding is not responsible for poor or shortsighted business decisions concerning marital assets. See *Gershman* v. *Gershman*, supra, 286 Conn. 346–47. But, in the present case, the plaintiff's transactions were not just questionable investment decisions; they also violated a court order. Even if the court order

imposes a burden on a party, or the party believes his actions are otherwise justified, the party may not act unilaterally in contravention of the order. See, e.g., *Sablosky* v. *Sablosky*, supra, 258 Conn. 719–20. Moreover, if the plaintiff in the present case did not wish to bear sole responsibility for the potential risks of his actions, he should not have engaged in self-help by selling the stocks and exercising the options without first consulting the defendant or the court. Because the defendant had no say in the transactions that the plaintiff executed, the trial court acted within its discretion when it determined that the plaintiff had violated the automatic orders and that he should bear any losses caused by his actions.

We also conclude that the trial court acted properly in remedying the defendant's loss of her share of the marital estate by adjusting in her favor the distribution of the marital assets. Even though the trial court's property distribution is governed by § 46b-81, and providing a remedy for a violation of a court order is not one of the enumerated statutory factors, the trial court nevertheless had the discretion to remedy the plaintiff's violations of a court order through its distribution of the parties' marital property. See *Robinson* v. *Robinson*, 187 Conn. 70, 71–72, 444 A.2d 234 (1982) ("Although created by statute, a dissolution action is essentially equitable in nature. . . . The power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances [that] arise out of the dissolution of a marriage." [Citation omitted; internal quotation marks omitted.]). The trial court could have distributed the marital assets pursuant to § 46b-81 and then separately ordered the plaintiff to issue a distinct payment to the defendant pursuant to its inherent authority. See *Clement* v. *Clement*, supra, 34 Conn. App. 643–44; cf. *DeMartino* v. *Monroe Little League, Inc.*, supra, 192 Conn. 278–79. The trial court, exercising its equitable discretion, instead combined these two steps into one, a method that is not without precedent. See, e.g., *Greenan* v. *Greenan*, 150 Conn. App. 289, 303, 91 A.3d 909 (upholding trial court's remedy for violation of court order and noting that trial court had "taken the plaintiff's [violation] into consideration in fashioning its [financial] orders" instead of issuing "a specific order to restore the funds" lost from violation [internal quotation marks omitted]), cert. denied, 314 Conn. 902, 99 A.3d 1167 (2014). Whether the trial court in the present case had ordered a payment separate from the property distribution or effected the payment as part of the property distribution, as it did, is a difference of form, not substance. The result of either method would be the same— each ultimately transfers funds to cover the value of the defendant's loss from the plaintiff to the defendant. We conclude, therefore, that the trial court properly exercised its discretion in affording the defendant a remedy by adjusting the property distribution to

account for the loss.

## B

The plaintiff claims that the trial court's award is nevertheless erroneous because it was based on an improper method for valuing the loss to the marital estate, rendering it excessive. We disagree.

If a trial court elects to make whole a party injured by another party's violation of a court order, any award it makes must be reasonable in light of the harm to the injured party. A trial court has the equitable discretion to choose whether to provide a remedy in the first place and to determine the amount of any remedial award in light of the specific circumstances of the case. See *Clement* v. *Clement*, supra, 34 Conn. App. 647; see also *AvalonBay Communities, Inc.* v. *Plan & Zoning Commission*, supra, 260 Conn. 243. "The essential goal" in making a remedial award "is to do rough justice, not to achieve auditing perfection," and, thus, the award may be based on reasonable estimations of the harm caused and the trial court's own "superior understanding of the litigation . . . ." (Internal quotation marks omitted.) *Goodyear Tire & Rubber Co.* v. *Haeger*, U.S. , 137 S. Ct. 1178, 1187, 197 L. Ed. 2d 585 (2017). The trial court's discretion, however, is not limitless. If the court elects to provide a remedial award, then the value of the award may not exceed the reasonable value of the injured party's losses. *DeMartino* v. *Monroe Little League, Inc.*, supra, 192 Conn. 279. Although a trial court may choose to award less under the circumstances of a particular case, a decision to order an award greater than the party's loss would exceed the award's remedial purpose. See id.; see also *Goodyear Tire & Rubber Co.* v. *Haeger*, supra, 1186 (trial court's "award may go no further than to redress the wronged party for losses sustained; in may not impose an additional amount as punishment for the sanctioned party's misbehavior" [internal quotation marks omitted]). In such a case, the excess instead serves merely to punish the offending party, a sanction that, as we have explained, requires a finding of contempt and thus likely would constitute an abuse of the trial court's discretion. See part I A of this opinion.

Moreover, the trial court's conclusions concerning the appropriate remedial award must be based on evidence presented to the court. *Nelson* v. *Nelson*, supra, 13 Conn. App. 367. The court must therefore allow the parties to present evidence concerning the loss and the proper amount of compensation, and to cross-examine adverse witnesses. Id. As with any other factual determination, the trial court's findings must be supported by the evidence. Id.

In the present case, the trial court determined the amount of the loss after a trial at which the parties were each afforded the opportunity to present evidence

concerning the extent of the loss, and the defendant adduced testimony from an expert witness. The plaintiff's counsel cross-examined the defendant's expert and also had the opportunity to call witnesses on behalf of the plaintiff but did not do so. The trial court further entertained argument on the issue.

After considering the parties' positions, the trial court credited the testimony of the defendant's expert and found that the transactions caused a net loss to the marital estate of $3.5 million. The court arrived at that amount by looking to the difference between (1) the value of the stock shares and options at the time the plaintiff either sold or exercised them, and (2) the value the shares and options would have had at the time of the trial following remand, when the shares or options would have been distributed, if the plaintiff had not sold or exercised them in violation of the automatic orders. The trial court determined that the shares and options had a total value of $2,562,190 when the plaintiff sold or exercised them and that, if the plaintiff had not done so, they would have had a value of $6,093,019 at the time of the trial. Taking the difference between these two values, the trial court found that the plaintiff's transactions had caused a net loss of approximately $3.5 million in value to the marital estate.

The defendant, however, was not necessarily entitled to be compensated for the full $3.5 million loss to the marital estate. Because that value reflected the loss amount to the entire marital estate, and not just the defendant's share, she presumably should have received no more than the losses fairly attributable to her share of the marital estate. Thus, the defendant's counsel acknowledged during closing argument that if, for example, the court awarded the defendant 55 percent of the marital assets, including the stock shares and options, she would be entitled to compensation for no more than 55 percent of the total losses to the marital estate.[7] The defendant's counsel also acknowledged that the amount of any remedial award should be adjusted for the taxes that would have been paid on any subsequent sale of the stock and exercise of the options, which was not reflected in the expert's valuation of the stock shares. In light of these factors, and the plaintiff's own valuations of the marital assets distributed, it is apparent that the trial court fairly determined the loss to the estate to be $3.5 million and that its adjustment of the distribution in favor of the defendant did not exceed the defendant's reasonable share of the loss resulting from the unauthorized transactions.[8]

Nevertheless, the plaintiff claims that the trial court improperly determined that the loss to the marital estate was $3.5 million. He claims that the trial court was required to calculate the loss to the marital estate by considering the value that the stock shares and options

would have had on the date of the dissolution decree, September, 2009, rather than at the time of the remand trial in February, 2014. For support, he relies on *Sunbury* v. *Sunbury*, 216 Conn. 673, 583 A.2d 636 (1990), in which we determined that a trial court issuing new property distribution orders on remand from an appellate court must divide the marital assets based on their value as of the original date of the dissolution decree, rather than based on their value at the time of any trial after remand. Id., 674, 676. We explained that, when dividing property pursuant to § 46b-81, "[i]n the absence of any exceptional intervening circumstances occurring in the meantime, [the] date of the granting of the divorce would be the proper time as of which to determine the value of the estate of the parties [on] which to base the division of property. . . . An increase in the value of the property following a dissolution does not constitute such an exceptional intervening circumstance." (Citation omitted; internal quotation marks omitted.) Id., 676.

Seizing on our conclusion in *Sunbury*, the plaintiff asks us to extend its reasoning to instances in which, as in the present case, the trial court is not valuing marital property for the purpose of distributing it under § 46b-81 but, rather, determining the proper remedy for a violation of a court order. Because the trial court effected the remedial award by adjusting its property distribution, the plaintiff argues that *Sunbury* applied to the trial court's remedial award and barred the court from considering the value that the stock shares and options would have had as of the time of the trial following remand, if the plaintiff had not sold or exercised them. Instead, he argues, the court should have looked to their value as of the dissolution date and determined the harm to the marital estate using that value. He also maintains that, because the trial court did not make any findings about the value of the stock shares and options as of the date of dissolution, a new hearing on all financial issues is required.

We disagree that *Sunbury* applies to the trial court's decision to remedy the plaintiff's violations of its orders. As the plaintiff tacitly admits in his brief to this court, *Sunbury* applies to the distribution of marital property between spouses pursuant to § 46b-81 but does not purport to place limits on the trial court's inherent authority to make a party whole when another party has violated a court order. *Sunbury* therefore did not limit the discretion of the trial court in the present case to consider the present value of the stocks and options when fashioning an appropriate remedy.[9] In considering how to make the defendant whole for the violation pursuant to its inherent authority, the trial court was justified in looking beyond the value of the stocks and options on the date of dissolution and, instead, to the value the defendant might actually have received from any stocks and options the court could have distributed to the defendant at the time of trial on remand. The

trial court's decision in the present case to effect its remedial award by adjusting the distribution, rather than by ordering the plaintiff to make a separate payment, does not alter the fact that its remedial award was made pursuant to its inherent authority, not § 46b-81. Thus, our holding in *Sunbury* does not apply to the trial court's remedial award.

The plaintiff further contends that, if *Sunbury* does not apply, the trial court should have valued the loss to the defendant by using the value the stocks and options would have had on the date of the violations, not the date of the trial following remand. Borrowing from principles of contract law, the plaintiff asserts that the defendant's damages should be calculated by looking only to the losses the defendant incurred as of the date of the breach, without regard to any later change in the value of the stocks and options. Thus, the plaintiff agrees that if, for example, he had sold the stock for less than fair market value at the time he sold it, he might be responsible to the defendant for the loss, but, because he exchanged the stock for its fair market value in cash, he argues that there was no cognizable loss to the estate on the date of the breach and, as a result, no basis for a remedial award to the defendant. The plaintiff contends that determining loss by looking to the stock value at the time of the trial on remand entails the use of an arbitrary date in time to fix the value because that value fluctuates daily.

We disagree that assessing the value of the stocks and options at the time of the remand trial was arbitrary or irrational. At the time of that trial, the court could determine with certainty the precise value of the loss to the marital estate caused by the plaintiff's transactions. The defendant rightfully expected that the plaintiff would obey the automatic orders and that the stocks and options would remain in the marital estate until distributed to the parties by the court following a trial on remand. If the plaintiff had not sold the stock or exercised the options, and the trial court divided the marital assets between the parties, including the stocks and options, the defendant would have enjoyed the benefit of any increase in their value. The plaintiff, however, unilaterally removed the stocks and options from the marital estate, preventing the court from distributing them in the form of stocks and options, and thus depriving the defendant of the opportunity to benefit from the increase in their value. Lacking the stocks and options to distribute, the court essentially awarded the defendant the *value* that her putative share of the stocks and options would have had at the time of the remand trial, putting the plaintiff in precisely the position she would have occupied at that time if the plaintiff had not violated the automatic orders. At that point, through its remedial award, the trial court made the value of the defendant's share of the marital estate whole against the losses caused by the plaintiff's viola-

tions. Certainly, the value of the stocks and options would fluctuate over time, meaning that the value required to make the defendant whole on a particular day would also fluctuate. But the trial court was entitled to put the defendant in the position she would have occupied in the absence of the plaintiff's violations of the automatic orders. As we previously observed, if the plaintiff did not wish to risk being held solely responsible for changes in the value of the stocks and options, he should not have sold the stock and exercised the options without proper authorization. In these circumstances, the trial court properly used the date of the remand trial to value the loss to the marital estate caused by the plaintiff's transactions.[10]

For these reasons, we conclude that the Appellate Court incorrectly determined that the trial court had lacked the authority to make the defendant whole for the plaintiff's violations of the automatic orders. We further conclude that the trial court's exercise of that authority was proper.

## II

In light of our conclusions in part I of this opinion, we next consider whether the Appellate Court's judgment may nevertheless be affirmed on one of three alternative grounds raised by the plaintiff. The first two concern the plaintiff's violations of the automatic orders and the third involves the trial court's award of retroactive alimony.

## A

The plaintiff first claims that his stock and option transactions did not violate the automatic orders established under Practice Book § 25-5 because they fall within the exception for transactions made "in the usual course of business . . . ." Practice Book § 25-5 (b) (1). The plaintiff argues that the trial court must have ignored the exception because it did not explicitly address the exception in its memorandum of decision. The plaintiff asserts that, in light of the trial court's failure to address this exception explicitly, the court's decision must be read as concluding that stock transactions can *never* fall within a person's usual course of business, a determination contrary to the plain language of § 25-5 (b) (1). We disagree that the trial court ignored this exception and conclude instead that the trial court implicitly determined that the exception does not apply.

The following additional facts and procedural history are relevant to our resolution of this issue. At trial, the defendant called an expert to quantify the economic loss to the marital estate incurred by the plaintiff's transactions, and the plaintiff's counsel objected to the testimony as irrelevant. While arguing the objection, the plaintiff's counsel suggested that the transactions did not violate the automatic orders, claiming they fell within the usual course of business exception inasmuch

as the plaintiff believed he was making a "prudent business" decision at the time. The trial court rejected this argument, responding that the plaintiff was "not in the business. If he were a used car dealer and sold a car in his lot, or if he were a boat salesman and sold a boat, he can do that. That's the ordinary course of business." After brief additional argument, the trial court overruled the objection and permitted the defendant's expert to testify.

In its memorandum of decision, the trial court found that the plaintiff had violated the automatic orders, explaining its finding as follows: "During the pendency of the action, and while the automatic orders were in effect, the plaintiff sold 28,127 shares of Omnicom . . . stock and exercised 75,000 Omnicom . . . stock options without court order or consent from the defendant. . . . The result of the sales was a significant loss to the marital estate. The court finds that these transactions did in fact violate the automatic orders."

Although the trial court did not explicitly state that it had found that the usual course of business exception was inapplicable in the present case, the lack of an express finding on this point is of no moment. When construing a trial court's memorandum of decision, "[e]ffect must be given to that which is clearly implied as well as to that which is expressed." (Internal quotation marks omitted.) *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 355, 133 A.3d 402 (2016). When, as in the present case, a trial court makes an ultimate finding of fact, we presume, in the absence of evidence to the contrary, that the court also made the subsidiary findings necessary to support its ultimate finding. See, e.g., *Sosin* v. *Sosin*, 300 Conn. 205, 244–45 n.25, 14 A.3d 307 (2011) (noting that subsidiary finding of wrongful conduct is implicit in trial court's award of compensatory interest under General Statutes § 37-3a); *Bornemann* v. *Bornemann*, 245 Conn. 508, 526, 752 A.2d 978 (1998) (explaining that trial court implicitly must have found that stock options were marital property when court distributed options between parties).

In the present case, the trial court expressly found that the plaintiff had violated the automatic orders, which necessarily implies that the court also made a subsidiary finding that the plaintiff's conduct did not fall within any exception. Moreover, even if there were any doubt, arising from the trial court's memorandum of decision, as to whether the court considered the exception, it would be dispelled by the court's consideration and rejection of the exception in overruling the plaintiff's objection to the defendant's proffered expert testimony. We therefore disagree that the trial court ignored the exception or failed to determine whether it applied.[11]

The plaintiff nevertheless contends that, even if the trial court rejected his claim that the exception applied,

this court should adopt one of two rules concerning stock transactions during a dissolution proceeding. He first argues for a bright line rule that stock sales are *always* made in the usual course of business and thus not subject to the automatic orders. As an alternative to this categorical rule, he urges us to adopt a rule *presuming* that stock sales fall within the usual course of business exception.

We decline to adopt either of these proposed rules because they are not supported by the text of the automatic orders set forth in Practice Book § 25-5. Those orders govern the transaction of "any property" and make no exception for transactions concerning certain types of assets, including stocks. Practice Book § 25-5 (b) (1). Instead, whether a particular transaction has been conducted in the usual course of business presents a question of fact, to be determined by looking to the circumstances of each case. See *Quasius* v. *Quasius*, 87 Conn. App. 206, 208, 866 A.2d 606 (reviewing trial court's finding concerning usual course of business exception for abuse of discretion because trial court is "in the best position to assess all of the circumstances surrounding a dissolution action" [internal quotation marks omitted]), cert. denied, 274 Conn. 901, 876 A.2d 12 (2005). Whether a transaction is conducted in the usual course of business does not turn solely on the type of asset or transaction but on whether the transaction at issue was "*a continuation of prior activities*" carried out by the parties before the dissolution action was commenced.[12] (Emphasis in original.) Id.

The plaintiff's proposed rules are also inconsistent with the purpose of the automatic orders. The status quo at the commencement of the litigation and the parties' usual course of business will vary significantly from case to case. A one size fits all rule or presumption will not accurately capture the status quo or usual course for all parties in the myriad of dissolution cases filed in our courts. The regular sale of stocks might be usual for a professional stock trader but unusual for someone who invests in stock funds through a retirement account, had not previously sold any of the stocks, and had no preexisting plan to sell those stocks until retirement. Moreover, a rule allowing a party either unconditional or presumptive permission to sell stocks without restraint would be subject to abuse. Significant stock sales have the potential to alter the character of a marital estate and might expose the other party to unwanted financial or tax consequences. For these reasons, determining a party's usual course of business is best treated as a question of fact to be decided by the trial court, unfettered by rules or guidelines that may or may not be appropriate under the unique circumstances of a particular case.

B

The plaintiff next claims the trial court incorrectly

concluded that the stock options that he had exercised were marital property, subject to distribution between the parties. We again disagree.[13]

Certain additional facts are necessary to our determination of this claim. The plaintiff received the options at issue in March, 2009, after filing the dissolution action but approximately six months before the trial court rendered judgment dissolving the parties' marriage in September, 2009. See *O'Brien* v. *O'Brien*, supra, 161 Conn. App. 581. The options did not vest until after the entry of the dissolution decree, with one group of options vesting in 2010, and the remainder in 2012. See id. The plaintiff exercised the options in two groups after they had vested, converting the options to cash. Id.

At the trial on remand, the plaintiff testified about the purpose of the options. He initially testified that the options "are not compensatory" and "are not earned," but are issued solely as retention incentives to employees "so that they stay at the company until . . . [the options] vest." Shortly thereafter, however, he clarified that the options had been awarded as compensation for his performance in the prior year, 2008, but that the options had a retentive component because they vested over time to create an incentive for him to stay with the company.

In its memorandum of decision, the trial court found that the options were marital property, explaining that, although "the options had not yet vested at the time of the original trial, they were awarded prior to the dissolution," and that the exercise of the options caused "a significant loss to the marital estate." The plaintiff challenges the court's determination that the options were marital property because, although they were awarded while the parties were still married, they did not vest until 2010 and thereafter, following the dissolution of the marriage in 2009. He further argues that they were not granted as compensation for any services performed during the marriage but were solely an incentive to remain employed until the time the options had vested. For these reasons, he contends that the unvested options were not marital property subject to distribution between the parties, and, consequently, the defendant could not have suffered any cognizable loss by virtue of his decision to exercise them.[14]

Unvested stock options may be considered marital property if they are earned during the marriage. See *Bornemann* v. *Bornemann*, supra, 245 Conn. 525. If they are awarded as compensation for services performed during the marriage, unvested options may properly be considered marital property, even if they will not vest until after the marriage is dissolved. See id. If unvested options are awarded for future services to be performed after the dissolution, however, then they are not considered marital property. See id., 524–25. Determining when the options were earned, and

whether they are for predissolution or postdissolution services, poses a question of fact for the trial court, and this court must accept the finding unless it is clearly erroneous. Id., 527.

In the present case, the record supports the trial court's finding that the plaintiff's options were marital property. The plaintiff's testimony about the purpose of the options award was conflicting: although he initially testified that they were exclusively a retention incentive for future services to be performed after the marriage was dissolved, he later testified that they were compensation for past services but that they had a delayed vesting schedule to encourage him to stay employed with Omnicom. The court apparently credited his testimony that the options represented payment for past services and did not credit his earlier assertion to the contrary. The trial court had the opportunity to observe the testimony firsthand and to evaluate the witness' attitude, candor, and demeanor while he was testifying. As the finder of fact, the trial court was free to credit all or any portion of the plaintiff's testimony.[15] See, e.g., *State* v. *Andrews*, 313 Conn. 266, 323, 96 A.3d 1199 (2014) ("[i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony" [internal quotation marks omitted]). Because the court's finding that the options were marital property has a sound basis in the evidence, that finding was not clearly erroneous, and, consequently, it must stand.

C

Finally, the plaintiff takes issue with the trial court's award of retroactive alimony. After the remand trial in February, 2014, the trial court ordered the plaintiff to pay alimony to the defendant, and made its order retroactive to the date when the court originally entered the dissolution decree after the original trial in 2009. The total retroactive alimony due under the order was $646,472, with payment to be made to the defendant no more than forty-five days from the issuance of the order.

The plaintiff does not dispute the trial court's power to award retroactive alimony generally but claims that the award in this case was improper. He argues that the short payment period will require him to pay the arrearage out of his share of the marital assets distributed by the trial court, effectively making it a reduction in his property distribution. Because he must pay the retroactive alimony from his own property distribution, he asserts, the award constitutes improper "double dipping." (Internal quotation marks omitted.) We are not persuaded.

The retroactive alimony award was not improper because trial courts are free to consider the marital assets distributed to the party *paying* alimony as a

potential source of alimony payments. See, e.g., *Krafick* v. *Krafick*, 234 Conn. 783, 804–805 n.26, 663 A.2d 365 (1995). Trial courts are vested with broad discretion to award alimony, and, when a court determines whether to award alimony and the amount of any such award, General Statutes § 46b-82 expressly authorizes the court to consider the marital assets distributed to each party in connection with the dissolution proceeding.[16] See General Statutes § 46b-82; see also *Krafick* v. *Krafick*, supra, 805 n.26. A trial court's alimony award constitutes impermissible double dipping only if the court considers, as a source of the alimony payments, assets distributed to the party *receiving* the alimony. See *Krafick* v. *Krafick*, supra, 804–805 n.26; see also *Greco* v. *Greco*, 275 Conn. 348, 357 n.8, 880 A.2d 872 (2005) (double dipping occurs only when trial court considers, as source for alimony, asset not available to payor). That is, if a trial court assigns a certain asset—a bank account, for example—to the party *receiving* alimony, it cannot consider that same bank account as a source of future alimony payments because the account has not been distributed to the party *paying* the alimony. In the present case, even if the plaintiff must, as he claims, use his own share of the marital assets to pay the retroactive alimony award, the trial court's award did not constitute double dipping because the assets the plaintiff might use to pay the alimony award were all awarded to him, not the defendant.

Nevertheless, the plaintiff asserts his double dipping claim as a basis for challenging the overall fairness of the trial court's property distribution award. He claims that, when the retroactive alimony payment is factored in, the trial court effectively awarded 78 percent of the marital estate to the defendant and awarded him only 22 percent. He asserts that "such a distribution is grossly inequitable and cannot be sustained." Once again, we disagree.

"[T]rial courts are endowed with broad discretion to distribute property in connection with a dissolution of marriage"; *Greco* v. *Greco*, supra, 275 Conn. 354; and are "empowered to deal broadly with property and its equitable division incident to dissolution proceedings." (Internal quotation marks omitted.) Id., 355. "Although a trial court is afforded broad discretion when distributing marital property, it must take into account several statutory factors. . . . These factors, enumerated in . . . § 46b-81 (c), include the age, health, station, occupation, amount and sources of income, vocational skills, employability . . . and needs of each of the parties . . . . Although the trial court need not give each factor equal weight . . . or recite the statutory criteria that it considered in making its decision or make express findings as to each statutory factor, it must take each into account." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 354–55.

"[J]udicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . In making those determinations, we allow every reasonable presumption . . . in favor of the correctness of [the trial court's] action." (Citation omitted; internal quotation marks omitted.) *Bornemann* v. *Bornemann,* supra, 245 Conn. 531. "Generally, we will not overturn a trial court's division of marital property unless [the court] misapplies, overlooks, or gives a wrong or improper effect to any test or consideration [that] it was [its] duty to regard." (Internal quotation marks omitted.) *Greco* v. *Greco,* supra, 275 Conn. 355.

Even if we accept the plaintiff's valuation of the trial court's property distribution for purposes of this appeal, we reject his contention that the trial court abused its discretion for at least three reasons. First, a distribution ratio of 78 percent to 22 percent is not, on its face, excessive, as the plaintiff contends. Indeed, we have upheld distributions awarding as much as 90 percent of the marital estate to one party. *Sweet* v. *Sweet,* 190 Conn. 657, 664, 462 A.2d 1031 (1983); but cf. *Greco* v. *Greco,* supra, 275 Conn. 355–56 (under circumstances of case, 98.5 percent distribution to one party was excessive). Second, the court's distribution reflected the unequal earnings potential of the parties. The trial court found that the plaintiff had cash compensation in excess of $1.2 million in the years prior to the dissolution, whereas the defendant had an earnings potential of $143,000. The plaintiff thus had an earnings potential of at least eight times that of the defendant. In addition, the trial court found that the plaintiff had received significant noncash compensation and would continue to do so in the future. Although the trial court awarded the defendant alimony to supplement her income, the amount of the award was to diminish every seven years, leaving the defendant with a progressively smaller income over time and justifying a greater up-front distribution. See footnote 4 of this opinion. Finally, as we have discussed, a significant component of the defendant's distribution was the trial court's remedial award for the plaintiff's violations of the automatic orders. See part I of this opinion. In these circumstances, we cannot conclude that the trial court's property distribution award was inequitable, as the plaintiff contends. We therefore reject this alternative ground for affirmance.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion the other justices concurred.

[1] Practice Book § 25-5 provides in relevant part: "The following automatic orders shall apply to both parties, with service of the automatic orders to be made with service of process of a complaint for dissolution of marriage . . . . The automatic orders shall be effective with regard to the plaintiff

. . . upon the signing of the complaint . . . and with regard to the defendant . . . upon service and shall remain in place during the pendency of the action, unless terminated, modified, or amended by further order of a judicial authority upon motion of either of the parties:

* * *

"(b) In all cases involving a marriage . . . whether or not there are children:

"(1) Neither party shall sell, transfer, exchange, assign, remove, or in any way dispose of, without the consent of the other party in writing, or an order of a judicial authority, any property, except in the usual course of business or for customary and usual household expenses or for reasonable attorney's fees in connection with this action.

* * *

"(d) The automatic orders of a judicial authority as enumerated above shall be set forth immediately following the party's requested relief in any complaint for dissolution of marriage . . . and shall set forth the following language in bold letters:

"**Failure to obey these orders may be punishable by contempt of court. If you object to or seek modification of these orders during the pendency of the action, you have the right to a hearing before a judge within a reasonable period of time**.

"The clerk shall not accept for filing any complaint for dissolution of marriage . . . that does not comply with this subsection." (Emphasis in original.)

[2] General Statutes § 46b-81 provides in relevant part: "(a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse. . . .

* * *

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[3] The parties disagree about the precise value of the property distribution, and the trial court made no specific findings with respect to that value. For purposes of this appeal, however, we rely on the plaintiff's valuation of the marital estate and property distribution.

[4] Specifically, the trial court ordered the plaintiff to pay alimony in the amount of $45,000 per month for the first seven years commencing from the date of dissolution, $37,500 per month for the next seven years, and then $25,000 per month for the next seven years. The alimony payments terminated after the third seven year period, unless one of the parties died or the defendant remarried beforehand.

[5] In her brief to this court, the defendant did not specifically argue that the trial court possessed the *inherent* authority to address the plaintiff's violations but instead focused her arguments on the trial court's *statutory* authority under § 46b-81. We nevertheless resolve the present appeal in reliance on the trial court's inherent authority because (1) the defendant raised this ground in her brief to the Appellate Court, and (2) at oral argument before this court, the plaintiff's counsel acknowledged that the trial court had inherent authority to address the plaintiff's violations of the automatic orders and clarified that the plaintiff was disputing only how the trial court exercised that authority in the present case.

[6] Other tools not addressed in the present case include the court's power to sanction parties and their attorneys for "dilatory, bad faith and harassing litigation conduct, even in the absence of a specific rule or order of the court that is claimed to have been violated." (Internal quotation marks omitted.) *Millbrook Owners Assn., Inc.* v. *Hamilton Standard*, 257 Conn. 1, 9–10, 776 A.2d 1115 (2001). Sanctions may include awarding litigation costs to the party harmed by the improper conduct, exclusion of certain evidence or testimony, or even the entry of a default, nonsuit or dismissal. See id., 11.

[7] Because the plaintiff's transactions removed the stock shares and options from the marital estate before the trial court could distribute them on remand, we do not know precisely what portion of the stock shares and

options the trial court might have awarded to the defendant, if they were still available for distribution. In these circumstances, a court could reasonably conclude that a party should be compensated for a percentage of the losses commensurate with that party's share of the marital estate as awarded by the trial court.

[8] The trial court in the present case took the plaintiff's transactions into account by adjusting the distribution of marital assets in the defendant's favor, but it did not articulate precisely what share of the marital estate it had awarded to the defendant. Nor did it articulate how much of its total property distribution was attributable to the plaintiff's violations of the automatic orders. The plaintiff has not claimed that the lack of articulation in this respect itself requires reversal. In the future, however, the trial court should articulate both the adverse impact that a party's violation had on the value of the marital estate *and* precisely how it compensated the injured party for that violation.

Nevertheless, in the present case, considering the plaintiff's valuation of the trial court's total property distribution and the plaintiff's suggested split of the marital assets, we conclude that the trial court's remedial award to the defendant did not exceed the defendant's reasonable share of the loss. According to the plaintiff's valuation of the marital assets, the total value of the assets divided, without regard to the stocks and options, was $6,514,836. The plaintiff had asked the trial court to divide the marital assets evenly between the parties. Even if the trial court followed the plaintiff's suggestion, the defendant would have been entitled to one half of this amount, that is, $3,257,418. In this scenario, the trial court also would have been justified in awarding the defendant 50 percent of the $3.5 million in losses caused by the plaintiff's violations of the automatic orders, an additional $1,750,000. The defendant was actually awarded a total of $4,428,784—meaning that she effectively received $3,257,418 of the marital assets and an additional $1,171,366 for the losses caused by the plaintiff. Accordingly, under the plaintiff's valuation, the defendant effectively received exactly one half of the losses caused by the plaintiff, less a discount of 33 percent for taxes. Consequently, even if we assume that the trial court gave the defendant exactly the share of the estate that the plaintiff argued that the defendant was entitled to, and even if we use the plaintiff's own valuation of the trial court's distribution, it is evident that the trial court's award did not exceed the reasonable value of the defendant's losses and thus did not amount to a penalty for the plaintiff's violations of the automatic orders.

[9] To be sure, if the plaintiff had not sold the stocks or exercised the options, the stocks and options would have remained a part of the marital estate and have been subject to distribution under § 46b-81. In that circumstance, *Sunbury* would have required the trial court to look to the value of the stocks and options as of the dissolution date. Of course, if the plaintiff had not sold the stocks or exercised the options, the defendant would nevertheless have benefited from any increase in the actual value of any stocks or options she received in the distribution, even if the trial court could not have formally considered the increased value when distributing the assets.

[10] We are thus unpersuaded by the plaintiff's contract law analogy. A plaintiff in a breach of contract action is ordinarily entitled to be placed in as good a position as he would have been in the absence of the breach, and an award of damages may include lost profits. E.g., *West Haven Sound Development Corp.* v. *West Haven*, 201 Conn. 305, 319–20, 514 A.2d 734 (1986) ("The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . [I]t is our rule that [u]nless [prospective profits] are too speculative and remote, [they] are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach." [Citations omitted; internal quotation marks omitted.]).

[11] The trial court was fully justified in finding that the exception did not apply in the present case. The plaintiff was an attorney by profession, not a stockbroker, and the plaintiff has not directed us to any evidence that he otherwise had a regular practice of buying and selling stocks, either as a hobby or in the management of his personal finances. Nor did he present evidence of a regular practice of transacting his Omnicom stock that he had received as compensation for his employment. In fact, the plaintiff testified that his sale of Omnicom stock in 2009—when the automatic orders were in effect—was the first time he had sold such stock.

[12] We do not suggest, as the trial court did, that the usual course of business exception is reserved only for transactions made in connection with a party's business or profession; rather, because the automatic orders are intended to maintain the status quo between the parties, the exception would appear to extend to personal transactions, but only if any such transactions are conducted in the normal course of the parties' ordinary activities, such that both parties would fully expect the transactions to be undertaken without prior permission or approval. Even if the trial court took a more limited view of the exception, however, that view would not provide a basis for reversal of the trial court's financial orders. The testimony in the present case indicates that the plaintiff had not previously sold stocks earned as part of his compensation, and, thus, he cannot establish a preexisting practice of selling these assets, even under a more expansive interpretation of the exception. See footnote 11 of this opinion.

[13] The Appellate Court did not address this argument, concluding that the plaintiff had waived it. *O'Brien* v. *O'Brien*, supra, 161 Conn. App. 580 n.4. Because the claim cannot succeed on its merits even if preserved, we need not consider whether it was waived.

[14] We note that, in the present case, whether the options were marital property is irrelevant to our determination that the plaintiff's exercise of those options violated the automatic orders, which expressly bar the sale, transfer, or exchange of "any property," not just marital property, during the pendency of the dissolution proceedings. Practice Book § 25-5 (b) (1). We consider whether the options were marital property because that issue is relevant to determining the extent of any losses that the defendant may have sustained and that are attributable to those transactions and, thus, to the plaintiff.

[15] The trial court's finding is also supported by the Omnicom plan governing the issuance of stock options, which was entered into evidence at trial. That plan makes no reference to options being awarded for future services or retention purposes, and does not make the exercise of any options contingent on meeting any future performance goals.

[16] General Statutes § 46b-82 (a) provides in relevant part: "At the time of entering the decree, the Superior Court may order either of the parties to pay alimony to the other, in addition to or in lieu of an award pursuant to section 46b-81. . . . In determining whether alimony shall be awarded, and the duration and amount of the award, the court shall consider the evidence presented by each party and shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate and needs of each of the parties *and the award, if any, which the court may make pursuant to section 46b-81*, and, in the case of a parent to whom the custody of minor children has been awarded, the desirability and feasibility of such parent's securing employment." (Emphasis added.)