******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# D'ANNA WELSH *v.* WILLIAM V. MARTINEZ
## (AC 41115)

Lavine, Prescott and Elgo, Js.

*Syllabus*

The defendant, W, appeals from the judgment of the trial court holding him in contempt for violating the terms of an asset standstill order. The plaintiff had brought an action against W seeking to recover damages for, inter alia, tortious invasion of privacy. The matter was tried to a jury, which returned a verdict in favor of the plaintiff in the amount of $2 million, and the court awarded punitive damages in the amount of $360,000. Thereafter, the court ordered that W was enjoined from voluntarily transferring or encumbering any assets except business assets in the ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support, and also granted the plaintiff's application for a prejudgment remedy. The plaintiff subsequently filed a motion for contempt alleging that W transferred more than $2 million to his then-wife, C, by depositing all of his wages directly into her bank account for the purpose of defeating the asset standstill order. The trial court granted the motion for contempt and imposed a compensatory fine of $2.2 million payable to the plaintiff in the amount of $25,000 per month. From the judgment rendered thereon, W appealed to this court. *Held:*

1. W's claim that the trial court improperly found him in contempt because the asset standstill order lacked sufficient clarity and was ambiguous was unavailing: the plain language of the order prohibited W from depositing the entirety of his income to C's bank account over several years, after his own bank account into which his wages previously were deposited was frozen, for the purpose of shielding those assets from the reach of a judgment creditor, the asset standstill order provided sufficient notice to a reasonable person that the wholesale transfer of wages to the account of a third party was not permitted, and evidence in the record supported the court's determination that W wilfully had violated the order, including evidence that C's bank account was opened for the express purpose of placing the entirety of W's wages outside the reach of a judgment creditor; accordingly, the trial court did not abuse its discretion in holding W in contempt.

2. W could not prevail in his claim that the trial court failed to consider his ability to pay in imposing a compensatory fine: that court found that W had sufficient income and other assets that rendered him financially able to pay the monthly amount ordered, and that finding was substantiated by evidence in the record, which included W's testimony that he earned a gross annual income of $1.2 million and that he had no other long-term debt aside from monthly mortgage payments and certain divorce related obligations, and statements from individual retirement accounts held by W were admitted into evidence as full exhibits, and, therefore, the court reasonably could have concluded that W had not proven a financial incapacity to comply with its fine, and its finding that W possessed sufficient income and other assets to pay that fine was not clearly erroneous.

3. Although the trial court properly concluded that the plaintiff was harmed by W's contemptuous conduct, the court abused its discretion in imposing a compensatory fine without the necessary factual basis: even though the court properly found that the principal loss sustained by the plaintiff was the inability to employ statutory collection procedures against W, including the remedy of attachment as to the $2,220,400.67 in wages that W deposited into C's bank account, compensatory fines must be confined to actual losses sustained as a result of noncompliance with a court order, the ability to attach an asset is distinct from the ability to execute on an attachment to satisfy an outstanding judgment, and the court failed to furnish an adequate factual basis to support its determination that the plaintiff had proven $2.2 million in actual pecuniary losses, as an attachment merely provides security for a judgment creditor, who may execute on the attachment depending on a number of

factors, including the extent to which the judgment has been satisfied and the existence of other attachments on the assets of the judgment debtor, the court made no findings, apart from finding that the plaintiff's ability to attach such assets was impaired, to provide the requisite factual basis for its compensatory fine and, in the absence of such findings, could not ensure that the fine was confined to actual losses sustained; accordingly, the case was remanded to the trial court for a new hearing limited solely to the issue of damages to determine the measure of loss that occurred as a result of W's contemptuous conduct in violation of the court's order.

Argued February 4—officially released August 20, 2019

*Procedural History*

Action to recover damages for, inter alia, the defendant's alleged invasion of privacy, and for other relief, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Robaina, J.*; verdict and judgment for the plaintiff, from which the defendant appealed to this court, which affirmed the judgment; thereafter, the plaintiff filed a motion to prevent fraudulent transfer of property; subsequently, the court, *Graham, J.*, entered an order enjoining the defendant from transferring certain assets; thereafter, the court, *Robaina, J.*, granted the plaintiff's application for a prejudgment remedy; subsequently, the court, *Moll, J.*, granted the plaintiff's motion for contempt and rendered judgment thereon, from which the defendant appealed to this court; thereafter, the court, *Moll, J.*, denied the defendant's motion for articulation; subsequently, the defendant filed a motion for review with this court, which granted the defendant's motion for review but denied the relief requested. *Reversed in part; further proceedings*.

*Jeffrey J. Mirman*, with whom were *David A. DeBassio* and, on the brief, *Thomas J. Farrell*, for the appellant (defendant).

*Irve J. Goldman*, with whom, on the brief, was *Timothy G. Ronan*, for the appellee (plaintiff).

*Opinion*

ELGO, J. The defendant, William V. Martinez, Jr.,[1] appeals from the judgment of the trial court holding him in contempt for violating the terms of an asset standstill order. On appeal, the defendant claims that the court improperly (1) found him in contempt because that order lacked sufficient clarity and was ambiguous, (2) failed to consider the defendant's ability to pay in imposing a compensatory fine, and (3) abused its discretion in imposing that fine. We affirm in part and reverse in part the judgment of the trial court.

In 2010, the plaintiff, D'Anna Welsh, commenced a civil action (underlying action) against the defendant, in which she alleged tortious invasion of privacy, negligence per se, intentional infliction of emotional distress, and negligent misrepresentation. At trial, the jury was presented with "undisputed evidence" that the defendant "conducted extensive covert surveillance of the plaintiff over the course of several years. That surveillance included intimate video transmissions from her bedroom and shower, daily reports as to every notation made on her computer, and GPS monitoring of her vehicle. The jury also had before it evidence that although the defendant swore under oath before the [Superior Court] at [an] accelerated rehabilitation hearing . . . that the plaintiff 'had nothing to worry about' and that no further surveillance equipment remained in the plaintiff's home, the transmissions from her bedroom thereafter continued and the defendant continued to receive daily e-mail reports from the spyware on the plaintiff's computer. The jury also was presented with evidence that despite her request for the defendant to leave her alone, he continued to appear unannounced and uninvited at her home. His behavior terrified the plaintiff, particularly when he informed her that 'I can hear you from outside your house.' In addition, the defendant's angry and violent conduct left the plaintiff scared for her life."[2] *Welsh* v. *Martinez*, 157 Conn. App. 223, 241, 114 A.3d 1231, cert. denied, 317 Conn. 922, 118 A.3d 63 (2015). The jury thereafter returned a verdict in favor of the plaintiff on all counts and awarded her $2 million in damages, the propriety of which this court affirmed on appeal. See id., 240–46.

After the jury returned a verdict in her favor, the plaintiff filed a motion with the trial court seeking punitive damages in the amount of her attorney's fees. The trial court, *Robaina, J.*, granted that motion over the defendant's objection and awarded "the sum of $360,000 as punitive damages in favor of the plaintiff."[3] As a result, the plaintiff had an outstanding judgment against the defendant in the amount of $2,360,000 as of December, 2012.[4]

On the same day that the jury delivered its verdict, the plaintiff filed two pleadings relevant to this appeal.

The first was an application for a prejudgment remedy.[5] In the second, which was titled "Plaintiff's Motion to Prevent Defendant's Fraudulent Transfer of Property," the plaintiff alleged that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property in violation of [the Uniform Fraudulent Transfer Act, General Statutes § 52-552a et seq.]."

On July 9, 2012, the court, *Graham*, *J.*, held a hearing on the latter motion. At its conclusion, the court entered an order that stated: "The [defendant] is enjoined from voluntarily transferring or encumbering any assets except business assets in the ordinary course of business and personal assets for ordinary living expenses, including court-ordered alimony and child support" (asset standstill order).[6]

Weeks later, on July 31, 2012, Judge Robaina granted the plaintiff's application for a prejudgment remedy. In so doing, the court ordered: "[The] plaintiff is allowed to attach up to $2 million of the defendant's property and [the] defendant is to provide a disclosure of assets by August 10, 2012. No wage garnishment to be sought at this time." On June 24, 2013, in response to a motion by the plaintiff, the court entered an additional order requiring the periodic disclosure of assets by the defendant (asset disclosure order).[7]

On May 2, 2017, the plaintiff filed a postjudgment motion for contempt and an accompanying memorandum of law. In that motion, the plaintiff alleged that the defendant voluntarily had transferred more than $2 million to Cristina Martinez (Cristina) "by depositing his monies directly into her bank account for no valid purpose but for the purpose of defeating [the] asset standstill order." The plaintiff also alleged that the defendant had "concealed and refused to disclose his personal property, financial bank and trading accounts, and debts due and owing to him" in violation of the asset disclosure order. The defendant filed an objection to the plaintiff's motion, to which the plaintiff filed a reply.

The court, *Moll*, *J.*, held an evidentiary hearing on the plaintiff's motion for contempt on August 2, 2017. The plaintiff called three witnesses: David Baker, the vice president of corporate security at Farmington Bank; Jamie Cook, the custodian of records at People's United Bank; and the defendant.[8] At that hearing, the court received undisputed documentary and testimonial evidence indicating that, at the time that the verdict was rendered in the underlying action in 2012, the defendant was the sole holder of an account with Farmington Bank, into which he regularly deposited his wages. When that account became frozen in October, 2012, as a result of collection actions undertaken by the plaintiff, the defendant began depositing his wages in their entirety into an account with People's United Bank held solely by his then-wife, Cristina.[9] By his own admission,

the defendant made those deposits in a deliberate attempt to avoid the freezing of those funds. The court found, and the defendant does not dispute, that he deposited $2,220,400.67 into Cristina's account between October, 2012, and March, 2016.

In his testimony, the defendant confirmed that, at all relevant times, he was employed as a heart surgeon. His gross annual income at the time of the contempt hearing was $1.2 million; after taxes, the defendant earned approximately $700,000. With respect to his liabilities, the defendant testified that he made monthly mortgage payments of $7500 and monthly payments of $14,000 for his "divorce-related obligations." Beyond that, the defendant acknowledged that he had no other long-term debt. The defendant further testified that, after depositing his wages into Cristina's account, those funds later were used to pay ordinary living expenses, including court-ordered alimony and child support.[10]

In its memorandum of decision, the court concluded that the defendant's failure to disclose certain assets—namely, a retirement account, a $50,000 promissory note, three motor vehicles and a gun collection—did not constitute a wilful violation of the asset disclosure order. At the same time, the court found that the defendant's conduct in "depositing the entirety of his wages into Cristina's People's United Bank account for the period October 30, 2012 through March 24, 2016, constitutes a series of wilful violations of the asset standstill order. Because the *entirety* of his income was deposited to an account held in the name of Cristina alone, he is deemed to have 'voluntarily transferr[ed] or encumber[ed]' his income (i.e., a personal asset) beyond what was necessary 'for ordinary living expenses, including court-ordered alimony and child support.' [The defendant] engaged in such conduct knowingly, with full knowledge of the asset standstill order, and for the express purpose of placing the entirety of such funds outside the reach of the plaintiff (i.e., with the intention of depriving the plaintiff of significant statutory post-judgment procedures authorized by chapter 906 of the General Statutes). The court therefore finds [the defendant] in civil contempt." (Emphasis in original.) The court thus imposed a "compensatory fine" of $2.2 million "payable directly to [the plaintiff] in an amount of $25,000 per month, until such fine is paid in full," which amount the court found represented "the plaintiff's proven, actual losses as a result of [the defendant's] wilful violations of the asset standstill order." From that judgment, the defendant appealed to this court.

The defendant subsequently filed a motion to stay enforcement of the $2.2 million compensatory fine pending resolution of the present appeal. In denying that request, the court clarified that the compensatory fine was not intended to supplement the $2,360,000 award that the plaintiff had received in the underlying

action. Rather, the court explained that "[a]ny payment [the defendant] makes to the plaintiff in compliance with the contempt order serves to offset the amount of the judgment due."

I

The defendant contends that the court abused its discretion in holding him in contempt because the asset standstill order lacked sufficient clarity and was ambiguous. We disagree.

Before addressing the merits of the defendant's claim, we set forth certain general principles that govern our review. "[O]ur analysis of a [civil] judgment of contempt consists of two levels of inquiry. First, we must resolve the threshold question of whether the underlying order constituted a court order that was sufficiently clear and unambiguous so as to support a judgment of contempt. . . . This is a legal inquiry subject to de novo review. . . . Second, if we conclude that the underlying court order was sufficiently clear and unambiguous, we must then determine whether the trial court abused its discretion in issuing, or refusing to issue, a judgment of contempt, which includes a review of the trial court's determination of whether the violation was wilful or excused by a good faith dispute or misunderstanding." (Citations omitted.) *In re Leah S.*, 284 Conn. 685, 693–94, 935 A.2d 1021 (2007).

"As a general rule, [orders and] judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the [order or] judgment. . . . The interpretation of an [order or] judgment may involve the circumstances surrounding [its] making . . . . Effect must be given to that which is clearly implied as well as to that which is expressed." (Internal quotation marks omitted.) *State* v. *Denya*, 294 Conn. 516, 529, 986 A.2d 260 (2010). Furthermore, it is a fundamental tenet of construction that the question of ambiguity is resolved by considering the language in question as applied to the particular facts of the case. See, e.g., *Corsair Special Situations Fund, L.P.* v. *Engineered Framing Systems, Inc.*, 327 Conn. 467, 473, 174 A.3d 791 (2018) (concluding that statute in question "is ambiguous as applied to the facts of the present case"); *State* v. *Crespo*, 317 Conn. 1, 10 n.10, 115 A.3d 447 (2015) ("[a] statute may be clear and unambiguous as applied in one context but not in another"); *Lexington Ins. Co.* v. *Lexington Healthcare Group, Inc.*, 311 Conn. 29, 42, 84 A.3d 1167 (2014) (language in contract must be construed in circumstances of particular case and cannot be found ambiguous in abstract).

With those principles in mind, we begin by noting the context in which the asset standstill order arose. Weeks prior to its issuance, a jury returned a $2 million

verdict against the defendant. Immediately thereafter, the plaintiff filed a "Motion to Prevent the Defendant's Fraudulent Transfer of Property," in which she averred in relevant part that she had "a reasonable belief that [the] defendant will attempt to fraudulently transfer property . . . ." Following a hearing, the court issued the asset standstill order, stating in relevant part that the defendant "is enjoined from voluntarily transferring or encumbering any assets except . . . personal assets for ordinary living expenses, including court-ordered alimony and child support."

The plaintiff concedes that the defendant initially complied therewith, as his wages were deposited into his Farmington Bank account in the months subsequent to the issuance of the asset standstill order.[11] When that bank account was frozen in October, 2012, the defendant began depositing *all* of his wages into the People's United Bank account held solely by Cristina in an effort to shield them from a judgment creditor.[12] That undisputed fact lies at the heart of the court's decision in the present case.

In its memorandum of decision, the court acknowledged that the asset standstill order permitted the defendant to utilize his personal assets to make payments on ordinary living expenses and to satisfy family court judgments. The court nevertheless held that the plain language of that order prohibited the defendant from depositing the entirety of his income to Cristina's bank account over the course of several years. We agree.

As our Supreme Court has explained, "[c]ivil contempt is committed when a person violates an order of court which requires that person in *specific and definite language* to do or refrain from doing an act or series of acts. . . . One cannot be placed in contempt for failure to read the court's mind. . . . [A] person must not be found in contempt of a court order when ambiguity either renders compliance with the order impossible, because it is not clear enough to put a reasonable person on notice of what is required for compliance, or makes the order susceptible to a court's arbitrary interpretation of whether a party is in compliance with the order." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Leah S.*, supra, 284 Conn. 695.

On appeal, the defendant argues that the asset standstill order "may fairly be read to mean that [he] was permitted to transfer or encumber personal assets for ordinary living expenses and court-ordered alimony and support payments." We do not quarrel with that contention. To the extent that the defendant made any voluntary transfers of his personal assets to pay such expenses, including ones made from funds contained in his Farmington Bank account in 2012, those transfers certainly complied with the terms of the asset standstill

order. This case, however, is not about transfers of the defendant's personal assets to pay qualifying expenses. Rather, this case is about the transfer[13] of the defendant's wages (1) in their entirety, (2) into the bank account of a third party, (3) subsequent to the freezing of the defendant's own bank account into which his wages previously were deposited, (4) for the purpose of shielding those assets from the reach of a judgment creditor. We reiterate that ambiguity is determined by considering the language in question as applied to the particular facts of the case. Guided by that precept, we agree with the trial court that the voluntary transfer of the defendant's wages in their entirety into Cristina's account contravened the plain intent of the asset standstill order, irrespective of how those funds later were dispersed.

Ambiguity arises if the language in question, when read in context, is susceptible to multiple reasonable interpretations. See, e.g., *Francis* v. *Fonfara*, 303 Conn. 292, 300, 33 A.3d 185 (2012). In the context of the facts of this case, we conclude that the defendant's interpretation of the asset standstill order is not a reasonable one. The asset standstill order provided sufficient notice to a reasonable person that the wholesale transfer of wages to the bank account of a third party was not permitted. We therefore reject the defendant's claim that the asset standstill order, as applied to the facts of this case, lacked sufficient clarity or was ambiguous.

We further conclude that the court's determination that the defendant wilfully violated the asset standstill order is supported by the evidence in the record before us. The defendant testified that his Farmington Bank account became frozen in October, 2012, at which time the defendant and Cristina responded by opening a People's United Bank account solely in Cristina's name. The court found, and the evidence reflects, that her account was opened for the express purpose of placing the entirety of the defendant's wages outside the reach of a judgment creditor. By so doing, the court found that the defendant "engaged in a gross exercise of self-help, which the law disallows, and wilfully disobeyed the asset standstill order by depositing the entirety of his wages . . . into Cristina's bank account, outside the reach of the plaintiff." The court thus concluded that "[t]o exonerate [the defendant's] wages-related conduct would be an undue inducement to litigants' exercise of self-help." (Internal quotation marks omitted.) We concur with that assessment.

In rendering a judgment of contempt, the court recognized that contempt is a drastic measure, but emphasized that "this case, which does not involve the collection of a 'routine debt,' falls well outside the parameters of 'normal circumstances,' where the defendant has gone to great lengths to deprive the plaintiff of the ability to use statutory collection procedures. The court

concludes that extraordinary circumstances warrant the court's use of the contempt power in the present case." We agree and, therefore, conclude that the court did not abuse its discretion in holding the defendant in contempt.

## II

The defendant claims that the court failed to consider the defendant's ability to pay in imposing a compensatory fine. We do not agree.

In *Ahmadi* v. *Ahmadi*, 294 Conn. 384, 397, 985 A.2d 319 (2009), our Supreme Court addressed a similar claim, as the defendant in that case argued that "the trial court's contempt order was improper because the court failed to elicit evidence of the defendant's financial ability before crafting a payment order." In response, the court clarified that it was the defendant who bore the burden "to prove any financial incapacity." Id., 397. The court then articulated the standard applicable to appellate review of such claims, stating: "Whether the defendant established his inability to pay the order by credible evidence is a question of fact. Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence . . . we give great deference to its findings." (Internal quotation marks omitted.) Id., 397–98.

After finding the defendant in contempt of the asset standstill order, the court in the present case imposed a compensatory fine of $2.2 million "payable directly to [the plaintiff] in an amount of $25,000 per month, until such fine is paid in full." On appeal, the defendant submits that "[t]here is no mention in the trial court's memorandum of decision that suggests, let alone finds, that [the defendant] has an ability to pay the contempt fine." He is mistaken. On page sixteen of its memorandum of decision, the court plainly states: "The court finds that [the defendant] has sufficient income and other assets that render him financially able to pay the monthly amount ordered herein."

That finding is substantiated by the evidence in the record before us. At the contempt hearing, the defendant testified that he continued to earn a gross annual income of $1.2 million from St. Francis Hospital, which resulted in a net income after taxes in excess of $700,000, or almost $60,000 per month.[14] Also admitted into evidence as full exhibits were statements from certain individual retirement accounts held by the defendant. A statement from an account with Charles Schwab & Co., Inc., specifies an "account value" of

$802,888.19 as of May 31, 2017. A statement from an account with American Funds, administered by Capital Group, specifies an "[e]nding value" of $464,910.48 as of June 30, 2017. Furthermore, with respect to his liabilities, the defendant testified that he made monthly mortgage payments of $7500 and monthly payments of $14,000 for his "divorce-related obligations." Beyond those obligations, the defendant testified that he had no other long-term debt.

In light of the foregoing, the court reasonably could conclude that the defendant had not proven a financial incapacity to comply with the court's fine of $25,000 per month. The court's finding that the defendant possessed "sufficient income and other assets" to pay that fine is supported by evidence in the record and, therefore, is not clearly erroneous.

### III

The defendant also claims that the court abused its discretion in imposing the $2.2 million compensatory fine. Although we agree with the court's conclusion that the plaintiff was harmed by the defendant's contemptuous conduct, we disagree with its measure of the resulting damages. A new hearing on damages, therefore, is warranted in the present case.

As this court recently observed, "[w]e review the propriety of the fines imposed [for civil contempt] pursuant to an abuse of discretion standard." *Medeiros* v. *Medeiros*, 175 Conn. App. 174, 202, 167 A.3d 967 (2017). With respect to subordinate findings of fact, "we review the court's factual findings in the context of a motion for contempt to determine whether they are clearly erroneous. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Wethersfield* v. *PR Arrow, LLC*, 187 Conn. App. 604, 653, 203 A.3d 645, cert. denied, 331 Conn. 907, 202 A.3d 1022 (2019).

The following additional facts are relevant to this claim. In its memorandum of decision, the court found that the defendant wilfully deposited a total of $2,220,400.67 into Cristina's bank account in contravention of the asset standstill order and with the intent to deprive the plaintiff of statutory collection procedures. As the court found, "[b]y directing the deposit of his wages [into Cristina's bank account], [the defendant] made it impossible for the plaintiff to attach" those assets. On that basis, the court held the defendant in contempt and imposed a compensatory fine of $2.2 million. In so doing, the court found that "[t]he amount of the fine represents the plaintiff's proven, actual losses as a result of [the defendant's] wilful violations of the asset standstill order." The court made no other

factual findings with respect to the plaintiff's actual pecuniary losses.

In response, the defendant filed a motion to reargue, in which he alleged that the plaintiff had failed to present "evidence of what particular damages she sustained as a result" of his noncompliance with the asset standstill order. The defendant further alleged that the court "without explanation, apparently used as a basis for the amount of the fine of contempt the total amount deposited into the subject account. This amount is not the proper measure of damages to be used in an order of contempt. Rather, the amount must be specifically related to the damages caused by the purported contempt of the asset standstill order." By order dated November 30, 2017, the court denied that motion, stating: "The [defendant] has failed to demonstrate that the court overlooked a controlling decision or legal principle, that the court misapprehended the facts, that the court's decision contains inconsistencies, and/or that the court failed to address a legal claim raised previously."

After commencing the present appeal, the defendant filed a motion for articulation with the trial court, in which he sought, inter alia, an articulation of the factual basis of the court's finding that the compensatory fine "represents the plaintiff's proven, actual losses as a result of [the defendant's] wilful violations of the asset standstill order." In denying that motion, the court stated that it had "re-reviewed the memorandum and order. Based on that review, the court concludes that the requested articulations are not necessary for the proper presentation of the issues." The defendant then filed a motion for review with this court, in which he requested appellate review of the court's denial of his motion for articulation. In its March 21, 2018 order, this court granted review, but denied the relief requested therein.

Our analysis begins with the well established principle that "a trial court possesses inherent authority to make a party whole for harm caused by a violation of a court order, even when the trial court does not find the offending party in contempt." *O'Brien* v. *O'Brien*, 326 Conn. 81, 96, 161 A.3d 1236 (2017). As this court recently observed, "it has long been settled that a trial court has the authority to enforce its own orders. This authority arises from the common law and is inherent in the court's function as a tribunal with the power to decide disputes. . . . [I]n a contempt proceeding . . . a trial court has broad discretion to make whole a party who has suffered as a result of another party's failure to comply with a court order." (Citation omitted; internal quotation marks omitted.) *Nappo* v. *Nappo*, 188 Conn. App. 574, 596, 205 A.3d 723 (2019).

A close reading of its memorandum of decision indicates that the court endeavored to do precisely that. The

contemptuous conduct in this case involves a deliberate attempt on the part of the defendant to thwart the plaintiff's ability to utilize statutory collection procedures by depositing the entirety of his wages into the account of a third party in contravention of the asset standstill order over the course of several years. In addition, the compensatory fine that the court imposed was intended to offset, rather than augment, the plaintiff's recovery in the underlying action, as the court made clear in its ruling on the defendant's motion for stay. The court, in short, sought to make the plaintiff whole in the present case. Its decision to do so was both a proper exercise of the court's discretion and understandable given the facts of this case.

We nevertheless disagree with the measure of damages set forth in the court's memorandum of decision. Under our law, compensatory fines must be narrowly circumscribed, and must be "confined" to the actual losses sustained by a contemnee as a result of noncompliance with a court order. *DeMartino* v. *Monroe Little League, Inc.*, 192 Conn. 271, 279–80, 471 A.2d 638 (1984). As our Supreme Court explained, "[j]udicial sanctions in civil contempt proceedings may, in a proper case, be employed . . . to compensate the complainant for losses sustained. . . . Where compensation is intended, a fine is imposed, payable to the complainant. *Such fine must of course be based upon evidence of [the] complainant's actual loss* . . . . Civil contempt proceedings are not punitive—i.e., they are not imposed for the purpose of vindicating the court's authority—but are purely remedial. . . . [I]t is well settled . . . that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender. . . . [S]uch a compensatory fine *must necessarily be limited to the actual damages suffered by the injured party as a result of the violation* . . . ." (Citations omitted; emphasis altered; internal quotation marks omitted.) Id., 278–79. Moreover, the court must furnish an adequate factual basis to substantiate its actual loss determination. See *Medeiros* v. *Medeiros*, supra, 175 Conn. App. 203–204; *DPF Financial Holdings, LLC* v. *Lyons*, 129 Conn. App. 380, 387, 21 A.3d 834 (2011).

The facts of this case plainly indicate, and the court so found, that the principal loss sustained by the plaintiff was the inability to employ statutory collection procedures against the defendant, and the remedy of attachment in particular.[15] See General Statutes § 52-279 et seq. Nonetheless, the ability to attach an asset is both conceptually and procedurally distinct from the ability to execute on an attachment to satisfy an outstanding judgment.

The writ of attachment is an instrument intended to

secure the assets of a judgment debtor. See *Bernhard-Thomas Building Systems, LLC* v. *Dunican*, 286 Conn. 548, 557, 944 A.2d 329 (2008) ("[t]he purpose of the prejudgment remedy of attachment is security for the satisfaction of the plaintiff's judgment" [internal quotation marks omitted]); *Rhode Island Hospital Trust National Bank* v. *Trust*, 25 Conn. App. 28, 40, 592 A.2d 417 (*Foti*, *J.*, dissenting) ("remedy of attachment provides necessary security for the creditor by protecting it from the uncertainties of future events"), cert. granted, 220 Conn. 904, 593 A.2d 970 (1991) (appeal withdrawn July 10, 1992); *Cerna* v. *Swiss Bank Corp.*, 503 So. 2d 1297, 1298 (Fla. App.) ("a writ of attachment . . . serves as a lien upon property which may be the subject of execution upon a later-obtained judgment"), review denied, 513 So. 2d 1060 (Fla. 1987); *Northwestern National Ins. Co.* v. *William G. Wetherall, Inc.*, 267 Md. 378, 384, 298 A.2d 1 (1972) ("[a]n attachment on a judgment is a tool by which a judgment creditor can reach the assets of a judgment debtor in the hands of a third party").

At the same time, a properly served writ of attachment does not, in and of itself, establish a judgment creditor's entitlement to liquidate or possess the asset in question, but rather "enables a creditor to gain priority over any subsequent claim to the attached property," and impairs the judgment debtor's ability to dispose of the asset. *Mac's Car City, Inc.* v. *DiLoreto*, 238 Conn. 172, 179–80, 679 A.2d 340 (1996). As our Supreme Court explained long ago, an attachment "has no effect but to take the [asset in question] into the custody of the law, to secure it against the alienation of the debtor, and the attachment of other creditors, and to hold it to be levied upon by an execution . . . ." *Lacey* v. *Tomlinson*, 5 Day 77, 80 (1811); accord *Camp* v. *Bates*, 11 Conn. 50, 54 (1835) (when asset is attached "the hand of the law is upon it"). Furthermore, as with any prejudgment remedy, a defendant whose assets are the subject of an attachment is entitled to a hearing, at which the court must take into account "any defenses, counterclaims or set-offs" asserted by the defendant. See General Statutes § 52-278d; *TES Franchising, LLC* v. *Feldman*, 286 Conn. 132, 141, 943 A.2d 406 (2008) ("it is well settled that, in determining whether to grant a prejudgment remedy, the trial court must evaluate both parties' evidence as well as any defenses, counterclaims and setoffs").

We agree with the plaintiff that, had the defendant deposited his wages into an account like the one he maintained with Farmington Bank, she very likely would have been able to avail herself of the collection procedures codified in our General Statutes. For that reason, the court properly found that the plaintiff was deprived of the ability to utilize statutory collection procedures as a result of the defendant's contemptuous conduct. The court found, and the record substantiates,

that the plaintiff lost the ability to attach $2,220,400.67 in wages that the defendant deposited into Cristina's bank account.

The court nevertheless failed to furnish an adequate factual basis to support its determination that the plaintiff had proven $2.2 million in actual pecuniary losses as a result thereof. An attachment merely provides security for a judgment creditor; whether that judgment creditor ultimately may execute on the attachment, in whole or in part, to obtain satisfaction of an outstanding judgment is an altogether different question, and one that is dependent on a number of factors, including the extent to which the judgment has been satisfied and the existence of other attachments on the assets of the judgment debtor.[16] Furthermore, a judgment debtor who believes that a particular attachment constitutes an excessive levy may petition for relief from the court.[17] As a result, a judgment creditor's ability to execute on an attachment remains a possibility, not a certainty. We therefore fundamentally disagree with the plaintiff's contention that her actual losses are "equivalent to the total amount of deposits that were redirected by [the] defendant to [Cristina's] account" and rendered immune from attachment.

Apart from impairing the plaintiff's ability to attach such assets, the court made no findings that provide the requisite factual basis for its $2.2 million compensatory fine, such as the amount of attorney's fees expended by the plaintiff in pursuing the contempt motion. Absent such findings, the court could not ensure that its compensatory fine was confined to the actual loss sustained by the plaintiff, as required under Connecticut law. See *DeMartino* v. *Monroe Little League, Inc.*, supra, 192 Conn. 279–80; *DPF Financial Holdings, LLC* v. *Lyons*, supra, 129 Conn. App. 386–88.

It is axiomatic that this court, as an appellate tribunal, cannot find facts. See *State* v. *Edwards*, 314 Conn. 465, 478, 102 A.3d 52 (2014). "[T]his appellate body does not engage in fact-finding. Connecticut's appellate courts cannot find facts; that function is, according to our constitution, our statute, and our cases, exclusively assigned to the trial courts." (Internal quotation marks omitted.) *Hogan* v. *Lagosz*, 124 Conn. App. 602, 618, 6 A.3d 112 (2010), cert. denied, 299 Conn. 923, 11 A.3d 151 (2011). We therefore are not at liberty to resolve the question of precisely what actual pecuniary losses the plaintiff suffered as a result of the defendant's contemptuous conduct.

Because the court's finding that the plaintiff sustained an actual loss of $2.2 million lacks the necessary factual basis, we conclude that the court abused its discretion in imposing a compensatory fine in that amount. The parties thus "are entitled to a hearing on damages to determine [the precise measure of the loss that] occurred as a result of the defendant's contemptuous

conduct in violation of the court's order." *DPF Financial Holdings, LLC* v. *Lyons*, supra, 129 Conn. App. 388. Accordingly, a remand to the trial court for a new hearing limited solely to the issue of damages is necessary.

We are mindful of our Supreme Court's admonition that "a trial court in a contempt proceeding may do more than impose penalties on the offending party; it also may remedy any harm to others caused by a party's violation of a court order." *O'Brien* v. *O'Brien*, supra, 326 Conn. 99. In determining whether a compensatory fine is warranted, the trial court on remand must consider the question of actual pecuniary loss resulting from the defendant's contemptuous conduct, such as attorney's fees. The court should also consider the impairment of the plaintiff's ability to utilize statutory collection procedures and fashion whatever relief that the court, in its discretion, deems appropriate under the facts of this case. Such relief may include the issuance of an order requiring the defendant to return the $2,220,400.67 in deposited funds to an account that may be attached by the plaintiff.

The judgment is reversed only as to the order of damages and the case is remanded for a hearing on damages with respect to the court's judgment of contempt. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] William V. Martinez, Jr., was the sole defendant in the underlying civil action commenced by the plaintiff in 2010. See *Welsh* v. *Martinez*, 157 Conn. App. 223, 114 A.3d 1231, cert. denied, 317 Conn. 922, 118 A.3d 63 (2015). The plaintiff subsequently commenced a fraudulent transfer action against Martinez's then-wife, Cristina Martinez (Cristina), and other family members in the fall of 2016, which later was consolidated with the underlying civil action by order of the court in 2017. Because the contempt motion at issue in this appeal pertains solely to William V. Martinez, Jr., for purposes of clarity, we refer to him as the defendant in this opinion.

[2] For a more detailed account of the conduct that gave rise to this litigation, see *Welsh* v. *Martinez*, supra, 157 Conn. App. 225–34.

[3] The defendant did not challenge the propriety of that supplemental award on appeal.

[4] On April 23, 2013, the trial court granted the plaintiff's motion for post-judgment interest and ordered that "interest at the rate of 3.5 percent per annum is awarded as of December 25, 2012."

[5] We note that "[d]espite the apparent contradiction in terms, a prejudgment remedy may be granted after the entry of judgment but before appellate disposition in order to protect assets to satisfy the judgment." *Tadros* v. *Tripodi*, 87 Conn. App. 321, 335 n.9, 866 A.2d 610 (2005); see also *Gagne* v. *Vaccaro*, 80 Conn. App. 436, 454, 835 A.2d 491 (2003) ("a prejudgment remedy is available to a party who has prevailed at the trial level and whose case is on appeal"), cert. denied, 268 Conn. 920, 846 A.2d 881 (2004).

[6] We refer to the court's July 9, 2012 order as the "asset standstill order" both for convenience and because that is the nomenclature employed by the parties and the trial court in this case.

[7] The asset disclosure order required the defendant to provide quarterly asset disclosures to the plaintiff under penalty of false statement. In those disclosures, the defendant was obligated to identify: "(a) Any and all real property, personal property, title, rights, and thing of value whatsoever, in which [the defendant] has an interest from the period of July 9, 2012 through the date of the disclosure; (b) Any and all wages paid to [the defendant], including amounts, formulas, and their scheduled dates of disbursement, from the period of July 9, 2012 through the date of the disclosure; (c) The financial institution, location, account number, and monthly balances of all

bank or trading accounts ever held by, in the name of, or for the benefit of [the defendant] from the period of July 9, 2012 through the date of the disclosure; and (d) Any and all debts due and owing to [the defendant] from the period of July 9, 2012 through the date of the disclosure."

[8] The defendant did not call any witnesses during the contempt hearing.

[9] At the contempt hearing, the defendant testified that although the account was in Cristina's name alone, she provided him with full access to the account, including an ATM card with her name on it and her password information to access the account online.

[10] The evidence adduced at the contempt hearing includes statements from Cristina's account at People's United Bank. Although those statements provide specificity as to certain transactions, such as utility payments, they provide no explanation for numerous other transactions. For example, the November 27, 2014 statement includes a withdrawal of $6660 on October 28, 2014, for "Check 387," a withdrawal of $13,382 on October 31, 2014, for "Check 389," a withdrawal of $48,867.47 on November 3, 2014, for "Check 390," a withdrawal of $851.01 on November 6, 2014, for "Check 392," a withdrawal of $1550 on November 7, 2014, for "Check 393," a withdrawal of $1484.45 on November 18, 2014, for "Check 398," and a withdrawal of $2217.76 on November 18, 2014, for "Check 399."

[11] The court found, and the parties do not dispute, that the defendant's wages constituted "personal assets" as that term is used in the asset standstill order. (Internal quotation marks omitted.)

[12] The record before us includes a copy of a writ and attachment that the plaintiff served on the main office of People's United Bank for the purpose of attaching Cristina's bank account in connection with the present litigation. The record also includes a copy of the January 2, 2014 letter that Norma Jurnack, a legal service of process representative at People's United Bank, sent to the plaintiff's counsel, in which she stated: "This letter is in response to the Writ and Attachment . . . served on People's United Bank . . . . We have researched our records and found that [the defendant] [does] not maintain accounts at [People's] United Bank."

[13] In construing the asset standstill order, we accord the language contained therein its common meaning. See *Barnard* v. *Barnard*, 214 Conn. 99, 115, 570 A.2d 690 (1990). To "transfer" ordinarily means "to convey from one person, place, or situation to another." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 1328; see also Black's Law Dictionary (9th Ed. 2009) p.1636 (defining "transfer" as "[t]o convey or remove from one place or one person to another; to pass or hand over from one to another, esp. to change over the possession or control"). Application of that common meaning compels the conclusion that the defendant transferred personal assets when he deposited his wages into a third party's bank account in which he concededly had no legal interest.

[14] A copy of the defendant's December 26, 2015 pay stub was admitted into evidence at the contempt hearing. That document reflects a net annual income of $707,522.83. The record also contains the defendant's July 3, 2017 affidavit, in which he averred in relevant part that he currently was "paid one hundred thousand ($100,000) dollars per month."

[15] As the court found in its memorandum of decision, "[b]y directing the deposit of his wages [into Cristina's People's United Bank account], [the defendant] made it impossible for the plaintiff to attach" those assets.

[16] The court's memorandum of decision contains no finding as to whether the plaintiff had attached any other assets of the defendant besides his Farmington Bank account. For example, the court made no finding as to whether the plaintiff had filed an attachment on the defendant's real property known as 92 Northgate in Avon, despite the fact that Judge Robaina, in granting the plaintiff's application for a prejudgment remedy on July 31, 2012, ordered that the plaintiff was "allowed to attach property of the defendant to the amount of $2 million including, but not limited to property located at 92 Northgate, Avon, Connecticut . . . ." The defendant's quarterly disclosures of assets were admitted into evidence as full exhibits at the contempt hearing. Exhibit 10 (Q) is his July, 2017 disclosure, in which the defendant acknowledged his 100 percent interest in the 92 Northgate property. That disclosure also included a copy of his separation agreement with Cristina, which was incorporated into the judgment of dissolution rendered by the Superior Court on May 5, 2017, and which provides in relevant part that the defendant "shall retain the marital home located at 92 Northgate, Avon, Connecticut, free and clear of any claim by [Cristina]. . . ."

The court also made no factual findings as to whether the plaintiff had obtained any recovery on the underlying judgment in the five years that

had passed since the jury rendered a verdict in her favor, or the specific amount thereof. In its memorandum of decision, the court found that Farmington Bank notified the plaintiff on October 22, 2012, that it "was holding $26,717.83" in response to the attachment filed by the plaintiff. The court nevertheless made no finding as to whether the plaintiff recovered those funds in the years between that attachment and the contempt hearing.

[17] See, e.g., *Glanz* v. *Testa*, 200 Conn. 406, 411 n.3, 511 A.2d 341 (1986) ("[a] defendant who perceives that an attachment is excessive is free" to bring claim to court's attention); *E. J. Hansen Elevator, Inc.* v. *Stoll*, 167 Conn. 623, 629, 356 A.2d 893 (1975) (discussing case involving "an application for the reduction or dissolution of a claimed excessive attachment made in an action brought to the Superior Court"); *Hodgen* v. *Roy*, 169 P. 1143, 1144 (Kan. 1918) ("[a] court has authority to protect a defendant . . . by preventing an excessive levy" in attachment of property); 6 Am.Jur.2d 700, Attachment and Garnishment § 286 (2019) ("[a] debtor is entitled to relief from an excessive levy upon proper application to the court").